DAYTON WALTHER CORPORATION and the Fayette-Haulette Division of Dayton Walther Corporation, Defendants-Appellants,

v.

Rhonda Sue CALDWELL, Walter Caldwell, Plaintiffs-Appellees,

Terry D. Fowler, Billy D. Fowler, Stockberger Machinery, Inc., Defendants-Appellees,

Campbell Chain Company, Third Party Defendant-Appellee.

Nos. 1–878 A 232, 1–878 A 233.

Court of Appeals of Indiana, First District.

May 22, 1979.

William H. Vobach, Locke, Reynolds, Boyd & Weisell, Indianapolis, Darryl Peckinpaugh, Warner, Clark & Warner, Muncie, for defendants-appellants.

John T. Cook, Peter D. Haviza, Winchester, Wayne J. Lennington, Muncie, for Rhonda Sue Caldwell and Walter Caldwell.

James A. McDermott, James A. Strain, Paula M. Frost, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for Campbell Chain Co.

LOWDERMILK, Presiding Judge.

### STATEMENT OF THE CASE

A jury found defendants-appellants Dayton Walther Corporation and The Fayette-Haulette Division of Dayton Walther Corporation (Dayton Walther) and Stockberger Machinery, Inc. (Stockberger) liable for losses sustained by plaintiffs-appellees Rhonda Sue Caldwell and her father, Walter Caldwell, when a trailer manufactured by Dayton Walther and sold by Stockberger came loose from a truck and collided with an automobile being driven by Rhonda Caldwell. Dayton Walther brings this appeal after the Randolph Circuit Court entered judgment awarding Rhonda Caldwell $800,000 and awarding Walter Caldwell $9,159.50.

### FACTS

On August 29, 1974, Terry Fowler was driving a truck owned by his father, Billy

Fowler, along State Road 28 in Delaware County. Attached to the truck was an empty three-axle heavy equipment trailer which had been manufactured by Dayton Walther and purchased by Fowler from Stockberger. As the trailer passed over a bump in the highway, the trailer became disconnected from the truck and collided head-on with an automobile operated by seventeen-year-old Rhonda Sue Caldwell. Rhonda Caldwell suffered serious injuries; her two passengers died before medical assistance arrived.

Rhonda Caldwell filed a lawsuit on July 16, 1975, and named as defendants Terry Fowler, Billy Fowler, Dayton Walther, the State of Indiana, the Indiana State Highway Commission, and Stockberger. Her father, Walter Caldwell, brought an action against the same defendants to recover for loss of his daughter's services and for various expenses incurred for Rhonda's medical treatment.

On July 28, 1976, Dayton Walther filed a third party complaint against Campbell Chain Company (Campbell) in each case. Dayton Walther alleged that Campbell had manufactured the safety chain which was placed on the trailer and had expressly and impliedly warranted that the chain was of merchantable quality, fit for the purpose for which it was intended, and in full compliance with all applicable safety standards.

The causes of action against the State of Indiana and the Indiana State Highway Commission were dismissed with prejudice on November 29, 1977, after payment of $30,000 to the Caldwells. On December 29, 1977, the trial court granted Campbell's motion for a separate trial.

After holding a third pre-trial conference, the trial court entered an order on January 12, 1978, which defined the issues for trial. As to the first legal paragraph of each complaint:

"* * *

7. With respect to the defendant, Terry D. Fowler, the plaintiffs charge that said defendant was guilty of negligence in the following particulars:

(a) That said defendant negligently failed to properly attach or connect the trailer to the truck.

(b) That said defendant negligently failed to use safety devices to insure that the trailer would not be released from the truck.

(c) That said defendant failed to use safety chains that would meet the standards required by Indiana statute, and

(d) That said defendant negligently and carelessly drove the truck and trailer over a large hump in the roadway at an excessive speed.

8. With respect to the defendant, Billy D. Fowler, . . . the plaintiffs allege that said defendant is liable to the plaintiffs for the negligence of the defendant, Terry D. Fowler, on the theory of respondeat superior. . . .

9. As against the defendant, Dayton Walther Corporation and The Fayette-Haulette Division of Dayton Walther Corporation, the alleged manufacturer of said trailer, it is alleged that said manufacturer negligently designed, inspected and tested said trailer."

As to the second legal paragraph of each complaint:

"11. The second legal paragraph of the complaints of the plaintiffs is predicated upon the theory that a defective and unreasonably dangerous condition existed in the trailer at the time it was placed in the stream of commerce by the manufacturer and seller of said product. This involves the theory of strict liability in tort, as set forth in Section 402 A of the Second Restatement of Torts, which has been adopted as the law in Indiana. The only defendants named and charged with liability in the second legal paragraph are the defendants, Dayton Walther Corporation and The Fayette-Haulette Division of the Dayton Walther Corporation, the alleged manufacturer, and the defendant, Stockberger Machinery, Inc., the alleged seller of said product. The particulars in which the plaintiffs claim that said product was defective at the time of the alleged delivery thereof to the

purchaser are that there was allegedly attached to said trailer a safety chain which was defective in the manner of weld and in its tensile strength. Plaintiffs also contend that said product was defective in that it contained only one, instead of two, chains."

Trial of the consolidated causes of action commenced March 6, 1978. After the Caldwells presented their case in chief, the trial court granted Billy Fowler's motion for judgment on the evidence because the Caldwells had failed to prove that Terry Fowler was the agent of Billy Fowler at the time of the collision.

The jury returned verdicts against the Caldwells and in favor of Terry Fowler. The verdicts were in favor of the Caldwells and against Dayton Walther on the first legal paragraph and in favor of the Caldwells and against Dayton Walther and Stockberger on the second legal paragraph. The jury assessed Rhonda Caldwell's damages at $800,000 and Walter Caldwell's damages at $36,000. In response to Dayton Walther's motion to correct errors, the trial court reduced the award of $36,000 to $9,159.50.

## ISSUES

Dayton Walther contends that the trial court erred in

1. denying part of the motion in limine filed by Dayton Walther;

2. overruling Dayton Walther's objections to certain testimony which Dayton Walther characterizes as gruesome, inflammatory, immaterial, irrelevant, and prejudicial;

3. refusing to read Dayton Walther's tendered instruction concerning recovery for emotional trauma;

4. refusing to read Dayton Walther's tendered instruction concerning recovery for loss of earnings or loss of future earning ability;

5. overruling Dayton Walther's objection to certain statements made during the final argument by the attorney for the Caldwells;

6. refusing to read Dayton Walther's tendered instruction concerning recovery for future medical complications;

7. failing to find that the damages awarded Rhonda Caldwell were excessive; and

8. granting Campbell's motion for a separate trial on the issues raised by the third party complaint.

## DISCUSSION AND DECISION

*Issue One*

Dayton Walther contends that the trial court erred when it denied part of Dayton Walther's motion in limine.

■ In general, the denial of a motion in limine does not occasion reversible error. The harm, if any, occurs when the evidence is improperly admitted. *State v. Church of the Nazarene*, (1978) Ind., 377 N.E.2d 607; *Marsh v. Lesh*, (1975) Ind.App., 326 N.E.2d 626. The admissibility of that evidence is considered in Issue Two.

*Issue Two*

■ Dayton Walther asserts that the trial court erred in overruling Dayton Walther's objections to certain testimony which Dayton Walther characterizes as gruesome, inflammatory, immaterial, irrelevant, and prejudicial.

Dayton Walther argued at trial that the testimony of two police officers who described the condition of the two passengers in the automobile after the collision was irrelevant, immaterial, not probative, and only intended to inflame the prejudice of the jury. The trial court admitted the evidence after concluding that it was relevant to show the severity of impact.

The argument of Dayton Walther on appeal is summarized in the following statement in its brief:

"... these defendants [Dayton Walther] were not being sued for alleged fault in driving at an excessive rate of speed, and the severity of the impact really had nothing to do with any issue of

fault asserted against the appellants [Dayton Walther]."

This argument ignores the fact that the Caldwells had charged Terry Fowler with driving at an excessive rate of speed. Terry Fowler's liability, as well as that of Dayton Walther, was being determined at the trial.

In *Washington Theatre Co. v. Marion Theatre Corp.,* (1948) 119 Ind.App. 114, 130, 81 N.E.2d 688, 694, appears this resolution of a comparable specification of error:

"Appellant, Washington Theatre Company, asserts error in the admission over its objection of the testimony referred to in its specifications 6 to 18 of its motion for a new trial. The appellant contends that such evidence of conversations between Gregory, an officer of appellee corporation, and appellant Connors and the other specified testimony of other witnesses constituted hearsay evidence *as to it.* All of such material testimony was admissible as against the other defendant in the cause, and as such was proper. . . ." (Citations omitted, our emphasis)

In *Hogue v. McClintock,* (1881) 76 Ind. 205, 208–9, McClintock sued Samuel Hogue, Thomas Hogue, George Bone, and seven other persons to recover the value of certain wheat wrongfully taken from McClintock. McClintock obtained a judgment against Hogue, Hogue and Bone. Bone and Thomas Hogue appealed and challenged the admissibility of certain evidence:

"The grounds of objection to said several statements and admissions of Samuel Hogue were, that they were made in the absence of the appellants, and therefore were inadmissible against them. After the objections to the admission of these several declarations and admissions had been overruled, the appellants moved to strike them out, for the same reasons given against their admission as evidence. All the evidence so objected to, which consisted of declarations and admissions of Samuel Hogue, were unquestionably admissible against him; therefore, *the objections of the appellants to their admission at all in the case, and their motions to strike the evidence of them from the record, were too broad, and for that reason, if for no other, the objections and motions were properly overruled. . ."* (Citation omitted; our emphasis)

Dayton Walther maintains that the trial court had a duty to limit the jury's use of the evidence.

In *Indiana Union Traction Co. v. Pring,* (1911) 50 Ind.App. 566, 580, 96 N.E. 180, 185, evidence was admitted which was proper to prove the employer's knowledge of the employee's incompetency in general but not proper to prove the employee's negligence at the time complained of. The appellant argued that the jury probably considered the evidence for both purposes. The court on appeal responded:

". . . Conceding this to be true, the error was not in the admission of the evidence, because it is error to exclude evidence if admissible for any purpose. If appellant's counsel be correct in their contention, the error resulted from a failure to restrict and limit the evidence by proper instruction. Appellant, failing to tender such instruction, cannot be heard to complain of a prejudical influence resulting from its own neglect and omission. . . ." (Citation omitted)

In *State v. Vaughan,* (1962) 243 Ind. 221, 227, 184 N.E.2d 143, 146, our Supreme Court wrote:

". . . It is not error to admit evidence if it is relevant[,] material and competent for any use. If the use for which the evidence is admissible is limited, the burden is on the opposing party to ascertain that the evidence is considered by the trier of the facts for such limited purpose only. . . ." (Our insertion)

The transcript from trial reveals that Dayton Walther simply asked the trial court to deny admission of the evidence. Dayton Walther made no request that the evidence be admitted for limited purpose; Dayton Walther tendered no jury instruction to restrict or limit the jury's use of the evidence.

Dayton Walther cites *Kiefer v. State*, (1958) 239 Ind. 103, 153 N.E.2d 899, and *Evansville School Corp. v. Price*, (1965) 138 Ind.App. 268, 208 N.E.2d 689, as authority for the following statement:

". . . even if evidence is both material and relevant, where the evidence is both so gruesome or pathetic that it would tend to inflame a jury into rendering an irrational unfair verdict, and that evidence is also *unnecessary* to prove a relevant issue, then there is no question: that inflammatory evidence is not admissible." (Dayton Walther's emphasis)

We are not persuaded that *Kiefer, supra*, and *Price, supra*, support the broad statement for which Dayton Walther cites them as authority.

■ This court has acknowledged that error may occur if relevant evidence of *minimal* probative value is admitted when that evidence is likely to induce a jury to reach a decision based upon improper considerations. *Boles v. State*, (1975) 163 Ind. App. 196, 322 N.E.2d 722. Dayton Walther asserted at trial, however, that the evidence was not material, not relevant, not probative, and was introduced *only* for the purpose of inflaming the prejudice of the jury. Questions which are not specifically raised by the objections offered at trial cannot be considered on appeal. *Reed v. Trainor*, (1968) 142 Ind.App. 192, 233 N.E.2d 685.

Dayton Walther has not demonstrated error in the admission of the testimony.

*Issue Three*

■ Dayton Walther maintains that the trial court erred when it refused to read Dayton Walther's tendered instruction informing the jury that it could not award damages for emotional difficulties of Rhonda Caldwell resulting from the loss of her brother and friend in the collision.

The trial court did read the following instruction:

"If you find for the plaintiff, Rhonda Caldwell on the question of liability, on either legal paragraph of her complaint, then you must determine the amount of money which will fairly compensate her

for any element of damages proved by the evidence to have resulted from the fault of one or more defendants. You may consider (a) the nature and extent of her injuries; (b) whether the injuries are temporary or permanent; (c) the physical pain and mental suffering experienced in the past and reasonably certain to be experienced in the future *as a result of the injuries*; (d) physical disfigurement or deformity resulting from the injuries; (e) the plaintiff's ability or inability to have and to enjoy the pleasures of life that only those who are possessed of sound body and free use of its members can enjoy.

You are to determine whether these elements of damage have been proved, by a consideration of the evidence relating to damages. Your verdict must be based on the evidence, and not on guess or speculation. Testimony on the monetary value of pain, suffering, disfigurement or deformity is not needed, however, for the jury to put a monetary value on such elements." (Our emphasis)

Dayton Walther argues:

". . . It is well established that it is reversible error for a court to refuse to instruct on an essential specific element of a case when there has been evidence supporting it, and when it is consistent with the theory of the case, and only a general instruction has been given in that area of law: *Jackman v. Montgomery* (1974), 162 Ind.App. 558, 320 N.E.2d 770; *Barnes v. Deville* (1973), 155 Ind.App. 387, 293 N.E.2d 54; *Baltimore, etc. R. Co. v. Peck* (1913), 53 Ind.App. 281, 101 N.E. 674."

In *Jackman, supra*, the trial court refused an instruction concerning an automobile driver's duty to keep a lookout for other travelers on the highway. No instruction given had provided a definition of lookout.

In *Barnes, supra*, the trial court refused an instruction which explained that the knowledge required as an element of wanton misconduct could be either actual or constructive. The various instructions giv-

en did not explain that the knowledge could be constructive.

In *Peck, supra*, Peck alleged that the railroad company had permitted a fire to escape from its right of way and damage Peck's property on or about October 1, 1908. Evidence was introduced suggesting that Peck's property had been damaged early in September 1908. The trial court refused instructions directing the jury to find in favor of the railroad company if the jury determined (a) that the railroad company set its fire October 1, 1908, and (b) that Peck's property was damaged prior to that date.

In the case at bar, however, the trial court did instruct the jury concerning the elements for which Rhonda Caldwell could recover damages. Dayton Walther does not challenge the propriety of that instruction. Instead, it contends that the trial court should also have instructed the jury concerning the elements for which Rhonda Caldwell could not recover damages. While the reading of such an instruction would not necessarily have constituted error, we decline to impose a duty to read such a negative instruction when the jury has been properly instructed on the positive aspects of the same issue. See *Richmond Gas Corp. v. Reeves*, (1973) 158 Ind.App. 338, 302 N.E.2d 795. We must presume that the jury obeyed the instruction given. Dayton Walther has failed to cite authority on point for the proposition that refusal to give the negative instruction constituted error.

*Issue Four*

■ Dayton Walther asserts that the trial court erred in refusing to read the following instruction:

"No evidence has been presented concerning any lost earnings or as to the future earning capacity of Rhonda Caldwell or its diminishment. Accordingly, I instruct you as a matter of law you may not consider as an element of damages any losses of earnings or any loss of future earning ability which may have occurred, since that would involve impermissible speculation on your part."

We incorporate our statements made in regard to Issue Three. Additionally, in *Cooper v. High*, (1974) 262 Ind. 405, 410, 317 N.E.2d 177, 180, the trial court had refused an instruction which provided, ". . . Neither may you assess damages against the defendants for attorneys['] fees, trial preparation, or court costs, which plaintiff may have incurred. . . ." (Our insertion) Our Supreme Court held:

"No evidence was presented at the trial as to the attorneys['] fees, trial preparation or court costs. It would have been improper, therefore, for the trial court to give this instruction. . . ." (Our insertion)

*Issue Five*

■ Dayton Walther contends that the Caldwells' attorney misled the jury on the issue of damages during final argument. The Caldwells' attorney made the following statement:

". . . There's five senses, if I remember my health class, sight, hearing, smell, taste and touch, isn't that what they told us. She's either lost all or part of three of them. How do you put that in dollars? Of course, they have given her something too, you don't want to forget that. *They've given her a potential for epilepsy. They've given her a potential for meningitis.*

Mr. *Peckinpaugh* : Your Honor, I'm going to object to this argument in that there's no compensable element here. I think it's improper argument at this time.

The *Court* : The Court will overrule the objection.

Mr. *Peckinpaugh* : Thank you, your Honor. I apologize to the counsel for interrupting his argument.

Mr. *Cook* : (continuing) They've given her some abnormal fears. Then also they've given her this. Now neither the jury nor any of the medical doctors can restore those things to her. There's just no way. Everybody knows that. But you can take some of the load maybe off of her, you know, family. Because

maybe the jury does have the power to see that her financial problems are minimized. . . ."

Five sentences later the Caldwell's attorney explained a method of computation:

". . . How do we calculate this. I told you in the beginning, you know, it's —it's not possible to put on—it's not possible for the jury to measure pain in a dollar's worth of pain or a dollar's worth of impairment, but the law, the tables—the law lets us put these tables in about people's life expectancy, to give us a little formula here that we might be able to use, and that's the reason I was permitted to read to you that this girl has a life expectancy of 60.13 years. *I'm going to break this all down again for the loss of sight, taste, smell, leg, teeth, potential epilepsy, meningitis.* Would—that would be worth for the total of those, of the ability—the lack of the pleasures of life, would that be worth $15,000 a year? Well, if it would be, we're talking about $900,000.00. . . ."

In *Ohio & Mississippi Ry. v. Cosby,* (1886) 107 Ind. 32, 35–36, 7 N.E. 373, 375, appears this statement:

"The appellant requested the court to instruct the jury that, in order 'to justify the assessment of damages for future or permanent disability, it must appear that continued or permanent disability is reasonably certain to result from the injury complained of.'

This was a proper instruction. In *Cleveland, etc., R.R. Co. v. Newell,* 104 Ind. 264, 3 N.E. 836, it is said the jury may 'take into consideration all the consequences of the injury, future as well as past, when the proof before them renders it reasonably certain that future loss and suffering are inevitable.' That an injury may possibly result in permanent disability will not warrant the assessment of damages for a possible disability, unless it is also reasonably certain to follow."

In *Kirk v. Harris,* (1977) Ind.App., 364 N.E.2d 145, 148 the appellant objected to the reading of an instruction that provided:

" ' . . . The fact that an injury may possibly result in permanent disability is not sufficient to warrant the assessment of damages for a permanent disability.' . . . ' "

Judge Staton responded:

" . . . Such an instruction is completely consonant with our view that the jury must be able to base its award of damages on evidence of probative value rather than being left to speculate and conjecture. . . ." (Citations omitted)

"Potential" is defined as follows: "existing in possibility: capable of development into actuality." *Webster's Seventh New Collegiate Dictionary* 665 (1965). The jury, in essence, was informed during final argument that it could award Rhonda Caldwell damages for epilepsy and meningitis which might possibly develop later. Our Supreme Court in *Cosby, supra,* declared that damages cannot be awarded for a possible result; the result must be reasonably certain. We must hold that the trial court erred in overruling Dayton Walther's objection.

The Caldwells emphasize that the trial court instructed the jury to consider ". . . (c) the physical pain and mental suffering experienced in the past and reasonably certain to be experienced in the future as a result of the injuries. . . ." Is it realistic, however, to believe that this short phrase in the midst of one of the many final instructions read to the jury sufficiently impressed the jury and corrected any misunderstanding created during a final argument which was dramatically and persuasively addressed to the jurors?

A careful review of the evidence on this subject adds fuel to Dayton Walther's argument that the jury was misled in determining the amount of damages.[1]

The Caldwells rely upon the testimony of Dr. Goodell and Dr. Pell as evidence that

1. The weight of the evidence, of course, was a question for resolution by the jury. We set forth portions of the evidence solely for the purpose of demonstrating the likelihood that the jury was misled by the use of the word "potential" during final argument.

Rhonda Caldwell should be compensated for future suffering due to epilepsy and meningitis.

Dr. Goodell gave the following opinion in his deposition:

"Q. Because of the location of this injury, the skull fracture, is there any propensities toward this type of disease?

Q. By that disease, do you mean—do you mean meningitis?

Q. Yes, meningitis.

A. Well, I would say that because of the—the location of the fracture, and the fact that there has been disruption of the bone in that area around the sinuses, and the fact that there is a plastic plate, that there is a remote, a very tiny remote possibility that some infection could occur at a future date. Five or ten or thirty years from now. The chance of this occurring is very small indeed, but some such complications occurring after long intervals of time have been known to happen."

With regard to epilepsy, Dr. Goodell explained:

"A. Well, there is no way of predicting at this time whether she will actually ever have an epileptic seizure or not. I have already given testimony regarding my opinion concerning the lack of predictive value of the EEG. As far as I am concerned, there is no test that will provide information to any degree of reliability as to whether or not she will ever have epilepsy. Each year that goes by that no epileptic seizures occur, the chances of her having epileptic seizures are that much lower.

Q. I believe you told us earlier that your analysis of the various studies you thought was about forty percent?

A. Yes. Quite so. But you see, of course forty percent of the individuals with penetrating brain injuries who have epileptic seizures, the vast majority of them will have such a seizure within the first one, two or three years following the injuries." [2]

Dr. Pell testified at trial:

"Q. Now, Doctor, you have also testified that she is potential epileptic, is that correct?

A. Yes, sir.

Q. Can you tell the Court and jury the potential of her epilepsy?

A. Again, we're talking about rough statistics. The most of the statistics on traumatic epilepsy, where there's been injury to the skull and brain, come from the military population. They have a number of people who've sustained these injuries. And the location is very important. *In the location where Rhonda's been injured, it's a very difficult thing to come up with, because the military—I could not find good statistics.* But across the board, if a person has had a fracture of the skull, just a crack, not a piece of tissue being damaged and not in fragments like Rhonda, the average is five percent of that population developing epilepsy. Now, in the normal population, five out of a thousand would have epilepsy, roughly. So her odds move up by a figure of ten fold. If we look at the military statistics on depressed skull fractures in the back part of the brain, occipital region, thirty percent of the people develop traumatic epilepsy. If you look at the so-called parietal area, which is sort of the flat part of the skull, fifty percent of the people will develop post-traumatic epilepsy. *The frontal lobe area of the brain, I haven't—I have no good figures on, which is the one that's most concerned to us right now.*

2. Rhonda Caldwell suffered her injuries August 29, 1974. Trial commenced March 6, 1978.

Rhonda Caldwell had suffered no epileptic seizures as of the date of trial.

Q. But she does have a potential for epilepsy?

A. Yes, sir. And once the dura or the lining of the—the interline of the skull or the—the external lining of the brain has been involved, the odds go up.

Q. Well, in this particular case, you are aware that there were some twelve to thirteen tears of the dura mater?

A. Yes sir.

Q. In Rhonda's case?

A. (No audible response)

Q. Well, what significance would those twelve to thirteen tears in the dura mater have with regard to her potential for epilepsy?

A. I think it increases the potential, but *I can't give you a percentage.*

Q. But it does increase it?

A. Yes, sir.[3] " (Our emphasis)

Counsel for the Caldwells asked Dr. Pell whether there is treatment "for the probable epilepsy", and Dr. Pell corrected counsel:

"*Mr. Fisher*: Judge, I'm going to have to object to the characterization of epilepsy as probable. I don't think there's been testimony ----

*Mr. Cook*: I think that's what he said.

*Witness*: Potential.

*Mr. Cook*: Okay."

Dr. Pell also explained:

"Q. And the more time that passes, the lower the percentage is of the possibilities or potential of receiving epilepsy?

A. There's a two-fold sort of thing we see. The greatest risk for epilepsy following trauma is in the pediatric age group, the children let's say from six years of age or less. In any trauma involving significant

brain damage, which Rhonda has had, the location and the extent are probably the two key items for the acute epilepsy to occur, and *there's no record that she had any acute epilepsy.* Then we move into a relative silent zone in which the healing occurs. And then how potential the epilepsy is depends again on the location, on how much damage was done, and on the lacerations of the dura which is the lining, the external lining of the brain. *She has had enough injury to make it a —a real possibility, but I cannot give you a hard and fast number on it. Now, it's true that after two years of no seizures, her medicine's been stopped, and she's not had any problem to this time. Unfortunately, I have not been able to get ahold of the electroencephalographic report to see what the electrical potential looked like in her particular case.*" (Our emphasis)

With regard to the meningitis Dr. Pell testified:

"Q. You talked about the meningitis. What *is* her, in your opinion, her probabilities of having a condition of meningitis?

A. That's very difficult to state in percentage terms. The problem we have is that meningitis is an uncommon illness in the population at large. Probably—perhaps twenty for every 100,000 population. It's a very—it's a fairly rare illness. She's already had one episode. She has permanent defects in the skull, which, no matter how good the repair work is, are not as good as nature made her. And my major concern would be that how well

---

**3.** Dr. Pell's broad use of the word "potential" is shown by his following statement:

". . . Epilepsy is probably the electrical phenomenon of the brain in which an abnormal discharge occurs and spreads throughout the brain. The effect that it has on the person depends on where this electrical discharge occurs. In its most devastating form,

so-called grand mal epilepsy, the patient has what everybody appreciates to be a seizure. They may fall to the ground and jerk and have different tonic and clonic movements. *Everybody has a potential for this sort of behavior under the wrong circumstances.*" (Our emphasis)

sealed off the brain is to prevent any dental abscess, sinus infection, soft tissue inflammation, such as a —what we refer to as a cellulitis or a soft tissue infection around the eye, from spreading to the brain (unintelligible).

Q. If the brain isn't properly sealed off, then these things can happen, is that correct?

A. I think the potential is greater. I think most of the experts in the field would agree with that, that—that the bone does act as a barrier.

Q. So there is a greater potential for her to have meningitis?

A. I believe so.

\* \* \* \* \* \*

Q. You're telling then to the Court and jury that she has a potential for meningitis, is that correct?

A. That's correct. \* \* \* "

Dr. Pell stated that Rhonda Caldwell's future problems with epilepsy and meningitis were very real possibilities, but that opinion was expressed in the following context:

"Q. Now, can you state within the realm of medical certainty whether or not Rhonda Caldwell will ever contact any form of meningitis in the future?

A. I cannot.

Q. This would simply be a guess?

A. It is a guess.

Q. Strictly speculative on your part?

A. Speculative, sir.

Q. And the same with epilepsy?

A. Again there's—however good statistics show that it's a very real possibility. Both events."

This testimony can be summarized as follows with regard to Rhonda Caldwell's future suffering:

According to Dr. Goodell, there is a very tiny remote possibility that Rhonda Caldwell may suffer from meningitis in the future. No test will reliably predict wheth-

er she will suffer from epilepsy in the future, but most persons experience such seizures within the first three years after suffering injuries; more than three years had passed since Rhonda suffered her injuries, and she had experienced no seizures.

Dr. Pell is of the opinion that Rhonda has a potential for epilepsy and a potential for meningitis. He bases his opinion upon conjecture, guess, statistics which are not appropriate for the location of Rhonda's injuries, and an electroencephalographic report of Rhonda which he has not seen.

While this evidence may represent a valid summary in general of the ramifications of head injuries, it does not establish that there is a reasonable certainty that Rhonda Caldwell will suffer from meningitis or epilepsy in the future. Such evidence, at most, suggests a possibility of—potential for—future difficulties.

*Issue Six*

■ Dayton Walther argues that the trial court erred in refusing to read its tendered instruction concerning recovery for future medical complications. This is another negative instruction. We incorporate our statements made in regard to Issue Three. Furthermore, by reading the instruction the trial court would have usurped the jury's duty of weighing the evidence.

*Issue Seven*

Because the judgment must be reversed and the cause remanded for a new trial, we need not consider Dayton Walther's contention that the award of damages to Rhonda Caldwell was excessive.

*Issue Eight*

■ Dayton Walther maintains that the trial court erred when it ordered a separate trial for the issues raised in the third party complaints filed by Dayton Walther against Campbell. Essentially, Dayton Walther insists that Ind. Rules of Procedure, Trial Rule 14(C)[4] controls in the case at bar

---

4. "(C) Severance—Parties improperly impleaded. With his responsive pleading or by

motion prior thereto, any party may move for severance of a third-party claim or ensuing

rather than T.R. 42(B); [5] since Campbell did not request a separate trial until after Campbell filed its responsive pleading, Dayton Walther insists that the trial court was powerless to order a separate trial.

The construction which Dayton Walther imposes upon the procedural rules could lead to obvious problems and absurd results. If its reasoning were adopted, for example, a third party could *prevent* the trial court from ordering a separate trial simply by filing a motion for a separate trial the day after it filed its responsive pleading. We decline to construe the rules in such a manner.

Dayton Walther cites *City of Elkhart v. Middleton,* (1976) 265 Ind. 514, 356 N.E.2d 207. The Supreme Court held therein that the trial court had erred in denying a motion to implead a third party. In the case at bar, the trial court permitted Dayton Walther to file its third party complaints but then determined that the issues raised by the third party complaints should be tried separately.

We agree that *Middleton, supra,* is helpful, however, despite the difference in facts. At page 521 of 265 Ind., at page 212 of 356 N.E.2d, Justice Prentice wrote:

"Impleader is basically a procedural device of expedience, but since *certain circumstances cause it to fail in its purpose; i. e., when the addition of a party could contribute more problems than it would eliminate or alleviate,* it is clear that a party cannot have his third-party claims adjudicated in the same action as of right. It is appropriate, therefore, for a trial court to consider the relative advantages of impleading a third-party as against *the disadvantages which might result such as delay and complication of the trial, and the possibility that the*

*plaintiff, third-party defendant, or both might be prejudiced. . . ."* (Our emphasis)

T.R. 42(B) provides:

"(B) Separate trials. The court, *in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy,* may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury." (Our emphasis)

The fact that the trial court permitted Dayton Walther to file its third party complaints did not prevent the trial court from reassessing the complexity of the causes of action after pretrial conferences had clarified the claims and issues.

◼ The trial court ordered a separate trial after determining that the indemnification question would present too many complications at trial on the original complaints. Portions of the evidence introduced with regard to the third party complaints would require instructions to the jury limiting its use of the evidence; the third party complaints would introduce new questions of privity; the nature of evidence which Campbell would need to present would depend upon whether the Caldwells recovered against Dayton Walther on their theory of negligence, theory of products liability, or both. The trial court could reasonably have found that an attempt to present such a complex case to the jury would cause prejudice to *all* of the parties.

We commend the trial court for its superb efforts in overseeing the pre-trial proceedings. The record portrays admirably

claim as provided in this rule or for a *separate trial thereon.* If the third-party defendant is a proper party to the proceedings under any other rule relating to parties, the action shall continue as in other cases where he is made a party. * * *" (Our emphasis)

5. "(B) Separate trials. The court, in furtherance of convenience or to avoid prejudice, or

when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury."

the conscientious and persistent efforts of the trial court to promote an expeditious and orderly completion of the litigation.

We have discussed all issues which are apt to arise at a new trial. While the harmless error doctrine reflects recognition that a trial does not have to be absolutely perfect but only fair, we cannot determine in the case at bar whether the error was harmless. The jury awarded Rhonda Sue Caldwell $800,000; such a sizable award could easily have included damages for the "potential for epilepsy" and the "potential for meningitis." As we noted previously, it would be a unique group of jurors indeed which could overlook such a statement during a forceful final argument and cling instead to a short phrase read to them in the midst of the jury instructions.

We reverse the judgment in Appellate Cause No. 1–878 A 233 and remand Rhonda Sue Caldwell's cause of action to the trial court for a new trial. Dayton Walther has not demonstrated error with regard to Appellate Cause No. 1–878 A 232; accordingly, the judgment in favor of Walter Caldwell is affirmed.

LYBROOK and ROBERTSON, JJ., concur.