DAYTON WALTHER CORP. et al.

v.

Rhonda Sue CALDWELL et al.

No. 480S103.

Supreme Court of Indiana.

April 17, 1980.

William H. Vobach, Locke, Reynolds, Boyd & Weisell, Indianapolis, for appellants.

John T. Cook, Peter D. Haviza, Winchester, Wayne J. Lennington, Muncie, for appellees.

PIVARNIK, Justice.

This cause comes to us on a petition to transfer by Plaintiff-Appellee, Rhonda Sue

Caldwell, from the Court of Appeals. Plaintiff Caldwell was severely injured in an accident on August 29, 1974. On that date, Terry Fowler was driving a truck owned by his father, Billy Fowler, along State Road 28, in Delaware County. Attached to the truck was an empty three-axle heavy equipment trailer, which had been manufactured by Dayton Walther and purchased by Fowler from Stockberger Machinery, Inc. As the trailer passed over a bump in the highway, it became disconnected from the truck and collided head-on with the automobile operated by seventeen-year-old Rhonda Sue Caldwell. She suffered very serious injuries and her two passengers, her brother and a friend, died at the scene.

In consolidated actions, her father and daughter brought suit against the manufacturer and seller of the equipment, and the driver of the truck. The Randolph Circuit Court entered judgment in favor of the plaintiffs, awarding Rhonda Caldwell $800,-000.00, and awarding her father, Walter Caldwell, $9,159.50. The manufacturer, Dayton Walther, appealed.

The Court of Appeals, First District, reversed the judgment of the trial court and remanded for a new trial in Rhonda Caldwell's cause of action No. 1 878 A 233. The judgment in favor of Walter Caldwell's cause of action, No. 1 878 A 232 was affirmed. *Dayton Walther Corp. v. Caldwell,* (1979) 389 N.E.2d 723. On rehearing, the Court of Appeals, First District, clarified its opinion to specify the parties and to limit the new trial previously ordered to the issue of damages. *Dayton Walther Corp. v. Caldwell,* (1979) 393 N.E.2d 208.

The issue presented for our review on transfer is the issue designated as Issue Five in the Court of Appeals opinion, *Dayton Walther Corp. v. Caldwell,* (1979) 389 N.E.2d 723 at 729, concerning whether or not the court erred in overruling Dayton Walther's objection to statements made by Caldwell's attorney during final argument. The Court of Appeals held that the trial court erred in overruling Dayton Walther's objection. We find the Court of Appeals in

error in this regard and accordingly vacate its opinion on this issue. Since the Court of Appeals had set aside the judgment, they did not decide the issue designated as Issue Seven in the Court of Appeals opinion, 389 N.E.2d 723 at 733, which referred to the damages awarded to Rhonda Caldwell as being excessive. We will accordingly, decide that issue also. We find all other issues decided by the Court of Appeals to be correctly decided. We adopt the Court of Appeals opinion on these issues, and incorporate their opinion by reference herein. (See Appendix). We also vacate the Court of Appeals opinion on rehearing. Transfer is granted.

## I.

Dayton Walther contends that the Caldwell's attorney misled the jury on the issue of damages during final argument by comments regarding potential for epilepsy and meningitis. The Caldwell's attorney made the following statement: "There's five senses, if I remember my health class, sight, hearing, smell, taste and touch, isn't that what they told us. She's either lost all or part of three of them. How do you put that in dollars? Of course, they have given her something too, you don't want to forget that. They've given her a potential for epilepsy. They've given her a potential for meningitis.

> *Mr. Peckinpaugh* : Your Honor, I'm going to object to this argument in that there's no compensable element here. I think it's improper argument at this time.

> *The Court* : The Court will overrule the objection.

> *Mr. Peckinpaugh* : Thank you, your Honor. I apologize to the counsel for interrupting his argument.

*Mr. Cook*: (continuing) They've given her some abnormal fears. Then also they've given her this. Now neither the jury nor any of the medical doctors can restore those things to her. There's just no way. Everybody knows that. But you can take some of the load maybe off of her, you know, family. Because maybe the jury does have

the power to see that her financial problems are minimized. The jury does have the power to see that maybe she could have some material things that has a meaning to ladies and gentlemen. I'm talking about things like having enough money for nice clothes, having enough money for vacations. She isn't going to have much. Have enough money for pleasant—to have a pleasant home and surroundings, and have enough money to have the very best medical treatment. How do we calculate this? I told you in the beginning, you know, it's—it's not possible to put on—it's not possible for the jury to measure pain in a—a dollar's worth of pain or a dollar's worth of impairment, but the law, the tables—the law lets us put these tables in about people's life expectancy, to give us a little formula here that we might be able to use, and that's the reason I was permitted to read to you that this girl has a life expectancy of 60.13 years. I'm going to break this all down again for the loss of sight, taste, smell, leg, teeth, potential epilepsy, meningitis. Would—that be worth for the total of those, of the ability—the lack of the pleasures of life, would that be worth $15,000.00 a year? Well, if it would be, we're talking about $900,000.00. That's what the figure is if you talked about her lifetime, if she's just given $15,000.00 a year. As Mr. (unintelligible) said, there isn't anybody that would have her injuries for $15,000.00 a year. If you say $10,000.00, if you say well, she ought to have $10,000.00 a year with that problem, then you're talking about $600,000.00. That's the way that —that's the way you can use those tables for those purposes, to determine pain, suffering, the loss of your members—or your senses, those senses can all be used to make this determination."

The above comments referring to either epilepsy or meningitis were the only language counsel used within its final argument. The general objection by counsel was the only objection that was ever made by defendants, either to the admission of the evidence or to comments on it in the closing arguments. Defendants did not object to the admission of the medical evidence at the time it was admitted, counsel did not address a motion to the court to strike the testimony of doctors giving evidence of potential epilepsy and meningitis at the close of their testimony, or at the close of all the evidence.

■ An attorney has a right and a duty to comment on the evidence that is before the jury for their consideration. This is the very purpose of final argument. Only when he misquotes the evidence or extends his comments to areas of fact or supposition that are not in the evidence presented is he acting improperly. It is difficult for us to understand how plaintiff's counsel's remarks here concerning epilepsy and meningitis could be considered misleading to the jury when his statements were couched in the *exact* language the witnesses had used. There was no statement by him that attempted to enlarge or extend the statements made by the medical witnesses which thereby gave a different or corrupted meaning to them. The doctors very clearly stated that the conditions existing in the brain and the dura of the plaintiff created conditions in which there was a "potential" for epilepsy and meningitis. Dayton Walther never offered an objection during the entire testimony of these doctors on the grounds now raised in this appeal. Counsel never moved to strike any of the answers of either doctor on the grounds raised in this issue before, nor did counsel make such a motion at the close of the testimony of either of the witnesses.

Both doctors testified at great length on this subject on direct examination and were cross-examined. Both witnesses testified that the injuries to the front of the skull and the face of the plaintiff were severe. Dr. Goodell testified that the main concern in administering to the plaintiff in the emergency room was her very survival. The fracture to her skull in the frontal part of her face and forehead, covering the frontal lobe of the brain was such that there were several breaks in which many fragments of bone shattered and penetrated into the frontal lobe of the brain. An area of the brain was exposed and apparent to

Dr. Goodell when he began his treatment of the plaintiff. It was necessary to remove 40 to 50 grams of brain tissue that had been damaged and contained blood and fragments of bone. There were thirteen lacerations of the dura, the lining of the brain, that had to be repaired by sutures. Both of the witnesses testified that the dura will not repair itself and that the closing of the tears done by Dr. Goodell was the only manner of treating this injury. Bone structures, muscles and nerves around the eyes, nose and sinuses were completely destroyed and had to be removed. Subsequent operations followed the emergency treatment in an attempt to correct the problems in these areas. There was permanent damage to the bone structures in these areas. These structures normally create a natural shield for the brain so that infections created by the functions of these organs do not reach the brain and occasion meningitis.

Dr. Goodell testified that brain scars are probably the most common cause of post-traumatic epilepsy, and that there would certainly be brain scars following the injuries and repair work done on plaintiff's brain. Goodell stated that the incidence of epilepsy is greater in penetrating than in non-penetrating types of injuries. He testified that a fragment of bone penetrating the dura mater and coming in contact with the cortex, is much more likely to cause epilepsy. He further testified that the threat of epilepsy to a person who has a trauma to the brain, such as plaintiff suffered here, was of so great a potential that he prescribed Dilantin for the plaintiff to prevent the onset of epileptic seizures. Plaintiff took this medication for at least a year. He stated that the highest potential for epilepsy exists in the first three years after such trauma, and that the potential has a tendency to decrease the longer a person goes without experiencing epilepsy.

Dr. Pell testified that plaintiff had had one episode of meningitis which was undoubtedly associated with the injury. This episode could have occurred one of two ways. Germs could have been sealed into the brain after it was repaired, or germs from infected areas of the nose, sinuses and eyes, could have traveled into the brain due to the lack of natural protection of the structures that had been removed. He further testified that plaintiff now has a prosthesis or plastic bone replacement in the forehead, which was used to act as a further barrier, should an infection in the skin occur, in an attempt to prevent the spread of infection from occurring as rapidly as it otherwise might. The prosthesis in the forehead also gave her protection from external blows to the skull in that area and acted to give cosmetic structure and appearance to her skull. His statement was that she has permanent defects in the skull and that the structures of the bone about the nose and eyes are not as good as nature made her, even though a very good repair job was done. He said that if the brain is not properly sealed off the potential for meningitis is greater. Dr. Pell's testimony was that in the normal population epilepsy occurs in about five out of one thousand persons. He stated, however, that if a person has had a fracture of the skull, just a crack, not a piece of tissue being damaged and not fragments penetrating it, the average is five out of 100 persons developing epilepsy. He stated, therefore, that the odds for epilepsy in those cases are increased tenfold. He further stated that with the tearing and trauma to the dura and its repair, the odds go higher. His statement was that anyone treating plaintiff Caldwell for the rest of her life would have to watch her for the potential of epilepsy and meningitis. All of these facts were testified to by the medical expert witnesses as being facts to a reasonable medical certainty.

The only issue regarding the question of certainty came about when questions were asked of the doctors as to what kind of estimate they could give as to whether or not plaintiff actually would develop epilepsy or meningitis in the future. The doctors both testified that though this potential exists, they could not state with any certainty that plaintiff would be one of the percentage that will get either of these diseases, rather than one of the percentage of per-

sons who will not. Statistics show that thirty percent of the people who had injury to the back part of the head develop traumatic epilepsy, fifty percent of the people who have injury to the flat part of the skull develop post traumatic epilepsy and five percent of those having damage and trauma to the front part of the skull develop traumatic epilepsy. This percentage could go up with a penetrating type wound, damage to the dura and other factors discussed above. Statistics on damage to the front part of the head are not as available as are those concerning damage to the other parts of the skull, and the doctors could not testify to statistics of percentages above those they had stated.

The appellant, Dayton Walther, relied heavily on *Palace Bar v. Fearnot*, (1978) Ind., 381 N.E.2d 858, to support their contention that the testimony of doctors here was speculation and not evidence at all. In *Palace Bar*, the medical evidence was without conflict that the plaintiff's decedent died from a heart attack. He had a history of heart trouble which had occasioned many previous attacks. The doctor testified in *Palace Bar* that, though it is possible for a heart attack to be caused by a fall, there was no way that he could state, with any certainty, that the fall down the stairs of the Palace Bar had precipitated the heart attack, and that it would have been pure speculation on his part to say so. He said there were many causes for the onset of a heart attack and it was not possible for him to state what had caused plaintiff decedent's attack. He further stated that he did not know whether the plaintiff decedent might have recovered if he had received earlier treatment and attention. The physician stated that there was no way of knowing the direction or progress of a heart seizure following its onset, and that he had known of many persons who were treated immediately whose seizure resulted in death. In *Palace Bar*, the plaintiff was not able to bring probative evidence that would justify the jury in inferring that the defendant's alleged failure to render aid to the decedent was the proximate cause of his death. Such an inference would have been

proper only if the physician had stated that, in his opinion, based on a reasonable medical certainty, immediate aid would have, or could have, saved Fearnot's life. The facts of *Palace Bar* are, therefore, different from those in this case. Here, there was direct evidence to a medical certainty, that serious injuries had resulted to the brain and its environs as a direct result of the acts of this defendant. The facts of the trauma and resultant injuries to the brain, the dura of the brain, and the surrounding structures in and about the nose, sinuses and eyes, were presented. The fact that these injuries resulted in a condition where the brain is not protected from the onset of epilepsy and meningitis, as it was in its natural state previous to the injuries, and therefore has an increased potential for the onset of these diseases, was established by direct medical testimony and to a reasonable medical certainty. The fact that the doctors were not able to state with any degree of certainty, that this plaintiff would, in fact, have one or both of these diseases, did not reduce their testimony to that of speculation, guess or possibility to the extent that the jury could not consider this potential in weighing the permanent damage occasioned by these injuries. To hold otherwise would virtually wipe out any appraisal by an expert medical witness as to an estimate of permanent future impairments which are involved in their description of present conditions and facts. The doctors could not state whether she would be one of the persons in her condition who would actually experience epilepsy or meningitis, but they could state with certainty that a percentage, probably higher than five percent of those in her condition, would. Plaintiff had already occasioned one onset of meningitis and had already been treated with Dilantin, for a year, to prevent seizures.

The situation in this case can be further distinguished from that in *Palace Bar, supra*, in that the defendant in *Palace Bar* had filed a motion for judgment at the close of plaintiff's evidence after having repeatedly objected to the testimony of the medical witnesses, on the grounds that the

plaintiff had not maintained her burden of proof in that she did not prove the proximate relationship between the appellant's acts or omissions and *Fearnot's* death. This motion was overruled and the defendants' renewed their motion at the close of all the evidence, which motion was again overruled by the court. As we have already stated in this case, Dayton Walther did none of these things. Therefore, even if it could be said *arguendo*, that the evidence as to the potential for epilepsy and meningitis of the plaintiff was improper evidence, the defendant did not timely raise the issue, and, therefore, it was properly before the jury to consider in its determination of amount of damages to award to this plaintiff.

In *Kern v. State of Indiana*, (1957) 237 Ind. 144, 144 N.E.2d 705, this Court held that where statements admitted into evidence without objection were hearsay but were relevant, the probative value of such statements was for the court or jury, notwithstanding the fact that said evidence could have been excluded if proper and timely objection had been made. The First District Court of Appeals, in *Norrington v. Smith*, (1973) 154 Ind.App. 413, 290 N.E.2d 60, 63, held that: "At the close of both plaintiff's and defendant's evidence, the defendant-appellants moved to strike the evidence tending to show that the occurrence was other than a collision. However, defendants never objected to the introduction of such evidence during the trial and the court properly overruled appellant's motion to strike the evidence." Thus, the Court of Appeals found, in that case, that even where the motion to strike was made after the close of all the evidence, the court was not required to grant the motion since no objection was made at the time of its presentation. It is a well-settled rule of law in Indiana that where incompetent evidence, hearsay or otherwise, is admitted without objection, its probative value is for the trier of fact to determine, notwithstanding the fact that such evidence might have been excluded if proper and timely objection had been made. *Kern v. State, supra* ; *Klingler v. Ottinger*, (1939) 216 Ind. 9, 22 N.E.2d 805; *Ziegler v. Tipton Lumber Company*, (1958)

128 Ind.App. 249, 147 N.E.2d 679; *Chicago District, etc., Corp. v. Evans*, (1946) 117 Ind.App. 280, 69 N.E.2d 627; *Myers v. Sparks*, (1926) 85 Ind.App. 342, 154 N.E. 39; *Spielman v. Herskovitz*, (1922) 78 Ind.App. 131, 134 N.E. 909.

Since the evidence demonstrated by the testimony of the expert medical witnesses was before the jury as an issue to be decided by them in reaching their verdict on damages, it was proper for plaintiff to comment on that evidence as he did. The objection of defendant Dayton Walther Corp., was only that "there was no compensable element there" and the court properly overruled that objection. The defendant did not follow this by any motion to strike the remarks or to admonish the jury to disregard them or to withdraw the submission to the jury so that the opportunity might be presented to the trial court to correct its own error if, in fact, there was error. This procedure was established by this court for a party to preserve the error of the trial court for review, as early as 1918, in *Ramseyer et al. v. Dennis*, (1918) 187 Ind. 420, 119 N.E. 716, and has been held to be the law ever since. In *Ramseyer* we stated that to preserve statements of counsel for appellate review, the opposing party must follow these procedures: "(1) to promptly interpose and state their objection, if reasonably required, to the objectionable language or argument, and request the court to so instruct the jury as to counteract any harmful effect of such language or argument, and if granted and such instructions were not sufficient to cure the error, follow such action by motion to have the submission set aside; (2) to promptly object to the improper language or argument of counsel and move to set aside the submission, stating reasons why the harm done could not be cured by any action the court might take in the matter." We further stated in *Ramseyer, supra*, "Appellants occupy the position of having properly objected to the argument claimed to constitute misconduct, with a ruling against them properly saved with an additional right to move that the submission be set aside, of which latter privilege

they failed to avail themselves, thereby holding a point in reserve to undo the verdict if unfavorable. This failure will be regarded as an admission that the alleged improper argument did not furnish ground sufficient to set aside the submission. Consequently, appellants are in the attitude of coming to this Court and asking that a judgment be reversed on account of an alleged error occurring at the trial of the cause which would not warrant the withdrawal of the case from the jury." 187 Ind.App. 420, 439–40, 119 N.E.2d 716, 720.

In 1949, we stated, in *Gamble v. Lewis*, 227 Ind. 455, 85 N.E.2d 629 at 635: "We cannot permit litigants to gamble on the possibility of a favorable verdict, and, after an adverse verdict has been returned, set it aside on appeal when the losing parties failed to move that the submission be set aside when the alleged error occurred." In 1977, the Court of Appeals, in *Kirk v. Harris*, Ind.App., 364 N.E.2d 145, at 149, set out procedures for a challenge based on supposed misconduct and stated: "Kirk's attorney objected, but he did not either ask for an admonishment or move for a mistrial. Even if we were to assume that he deemed such steps useless in light of the ruling on the objection, it is imperative that he proceed correctly to preserve the alleged error for appeal. The purpose of our stated procedures is to allow the trial court to correct its errors immediately." *See also, White v. Crow*, (1964) 245 Ind. 276, 198 N.E.2d 222; *Richmond Gas Corp. v. Reeves*, (1973) 158 Ind.App. 338, 302 N.E.2d 795; *Raisor v. Kelly*, (1972) 152 Ind.App. 198, 282 N.E.2d 871; *City of Shelbyville v. Morton*, (1965) 138 Ind.App. 460, 208 N.E.2d 705; *David Johnson Company v. Basile*, (1964) 136 Ind.App. 611, 199 N.E.2d 478. The defendant accordingly, did not preserve this issue for appeal and the Court of Appeals was incorrect in finding it to be a grounds for reversal of the judgment for damages.

Finally, we have to consider the issue presented by defendant Dayton Walther's contention that a verdict of $800,000 to the plaintiff was excessive. In addition to the evidence we have set out above in this opinion, the evidence was that plaintiff suffered a fractured right tibia in her arm, loss of two teeth, which were driven into her lip, a fractured orbit bone supporting her right eye, fractured nasal orbit bone, damage to both optic nerves and damage to her olfactory nerve. She underwent operations to her eyes to attempt to relieve double vision and a wall-eyed appearance caused primarily by damage to her left eye. There was permanent damage to the optic nerves of both eyes. "Wall-eyed" is a condition in which the eye tends to point to the side and in her case it was the left eye that had a wall-eyed appearance. This condition caused double vision because the eyes could not focus properly. Doctor Roch, who did the surgery and treatment of her eyes, testified that this condition could not be corrected further and was a permanent condition. He further testified that the damage to both optic nerves was permanent and that they could not be repaired any further. His testimony was that she had a 59% permanent impairment of her visual system and because of these conditions had a 56% permanent impairment of her whole person. Because some of the bones and nerves in and about her olfactory system were permanently destroyed and removed, she had completely and permanently lost her sense of smell, and with it, almost all of her sense of taste. She had recurring headaches and pain that were permanent in that they could not be reduced further. There was a great deal of testimony that she had recurring emotional fears and had a change in her personality that created many problems for her and would continue to do so. The testimony of the medical experts was that the injury to her frontal lobe and the partial removal of it damaged the part of the brain that controls emotions and personality. The testimony of the medical experts attributed many problems she had regarding her emotional fears, personality change, and distress with a marriage and her relationship with her father, to the damages caused by the negligence of this defendant. There was some damage to the cosmetic appearance of her face due to scarring, although it was stated that this was re-

duced to a minimum and was not a serious problem. The trier of fact had before it evidence of all of these damages. The plaintiff was a seventeen-year-old girl, who was twenty-one years old at the time of the trial, with a life expectancy of 60.13 years. This was ample evidence for them to find that $800,000 was a reasonable figure in damages. We cannot say, under the facts in this case, that their determination was based on emotion, sympathy, or prejudice, to the extent that it was unreasonable. We, therefore, will not disturb it.

Transfer is granted; the judgment of the trial court is affirmed.

GIVAN, C. J., and HUNTER and De-BRULER, JJ., concur.

PRENTICE, J., dissents.

### APPENDIX

*Issue One*

Dayton Walther contends that the trial court erred when it denied part of Dayton Walther's motion in limine.

■ In general, the denial of a motion in limine does not occasion reversible error. The harm, if any, occurs when the evidence is improperly admitted. *State v. Church of the Nazarene*, (1978) Ind., 377 N.E.2d 607; *Marsh v. Lesh*, (1975) Ind.App., 326 N.E.2d 626. The admissibility of that evidence is considered in Issue Two.

*Issue Two*

■ Dayton Walther asserts that the trial court erred in overruling Dayton Walther's objections to certain testimony which Dayton Walther characterizes as gruesome, inflammatory, immaterial, irrelevant, and prejudicial.

Dayton Walther argued at trial that the testimony of two police officers who described the condition of the two passengers in the automobile after the collision was irrelevant, immaterial, not probative, and only intended to inflame the prejudice of the jury. The trial court admitted the evidence after concluding that it was relevant to show the severity of impact.

The argument of Dayton Walther on appeal is summarized in the following statement in its brief:

". . . these defendants [Dayton Walther] were not being sued for alleged fault in driving at an excessive rate of speed, and the severity of the impact really had nothing to do with any issue of fault asserted against the appellants [Dayton Walther]."

This argument ignores the fact that the Caldwells had charged Terry fowler with driving at an excessive rate of speed. Terry Fowler's liability, as well as that of Dayton Walther, was being determined at the trial.

In *Washington Theatre Co. v. Marion Theatre Corp.*, (1948) 119 Ind.App. 114, 130, 81 N.E.2d 688, 694, appears this resolution of a comparable specification of error:

"Appellant, Washington Theatre Company, asserts error in the admission over its objection of the testimony referred to in its specifications 6 to 18 of its motion for a new trial. The appellant contends that such evidence of conversations between Gregory, an officer of appellee corporation, and appellant Connors and the other specified testimony of other witnesses constituted hearsay evidence *as to it*. All of such material testimony was admissible as against the other defendant in the cause, and as such was proper. . . ." (Citations omitted, our emphasis)

In *Hogue v. McClintock*, (1881) 76 Ind. 205, 208–9, McClintock sued Samuel Hogue, Thomas Hogue, George Bone, and seven other persons to recover the value of certain wheat wrongfully taken from McClintock. McClintock obtained a judgment against Hogue, Hogue and Bone. Bone and Thomas Hogue appealed and challenged the admissibility of certain evidence:

"The grounds of objection to said several statements and admissions of Samuel Hogue were, that they were made in the absence of the appellants, and therefore were inadmissible against them. After the objections to the admission of these several declarations and admissions had

 been overruled, the appellants moved to strike them out, for the same reasons given against their admission as evidence. All the evidence so objected to, which consisted of declarations and admissions of Samuel Hogue, were unquestionably admissible against him; therefore, *the objections of the appellants to their admission at all in the case, and their motions to strike the evidence of them from the record, were too broad, and for that reason, if for no other, the objections and motions were properly overruled. . ."* (Citation omitted; our emphasis)

Dayton Walther maintains that the trial court had a duty to limit the jury's use of the evidence.

In *Indiana Union Traction Co. v. Pring,* (1911) 50 Ind.App. 566, 580, 96 N.E. 180, 185, evidence was admitted which was proper to prove the employer's knowledge of the employee's incompetency in general but not proper to prove the employee's negligence at the time complained of. The appellant argued that the jury probably considered the evidence for both purposes. The court on appeal responded:

". . . Conceding this to be true, the error was not in the admission of the evidence, because it is error to exclude evidence if admissible for any purpose. If appellant's counsel be correct in their contention, the error resulted from a failure to restrict and limit the evidence by proper instruction. Appellant, failing to tender such instruction, cannot be heard to complain of a prejudicial influence resulting from its own neglect and omission. . . ." (Citation omitted)

In *State v. Vaughan,* (1962) 243 Ind. 221, 227, 184 N.E.2d 143, 146, our Supreme Court wrote:

". . . It is not error to admit evidence if it is relevant[,] material and competent for any use. If the use for which the evidence is admissible is limited, the burden is on the opposing party to ascertain that the evidence is considered by the trier of the facts for such limited purpose only. . . ." (Our insertion)

The transcript from trial reveals that Dayton Walther simply asked the trial court to deny admission of the evidence. Dayton Walther made no request that the evidence be admitted for limited purpose; Dayton Walther tendered no jury instruction to restrict or limit the jury's use of the evidence.

Dayton Walther cites *Kiefer v. State,* (1958) 239 Ind. 103, 153 N.E.2d 899, and *Evansville School Corp. v. Price,* (1965) 138 Ind.App. 268, 208 N.E.2d 689, as authority for the following statement:

". . . even if evidence is both material and relevant, where the evidence is both so gruesome or pathetic that it would tend to inflame a jury into rendering an irrational unfair verdict, and that evidence is also *unnecessary* to prove a relevant issue, then there is no question: that inflammatory evidence is not admissible." (Dayton Walther's emphasis)

We are not persuaded that *Kiefer, supra,* and *Price, supra,* support the broad statement for which Dayton Walther cites them as authority.

 This court has acknowledged that error may occur if relevant evidence of *minimal* probative value is admitted when that evidence is likely to induce a jury to reach a decision based upon improper considerations. *Boles v. State,* (1975) 163 Ind. App. 196, 322 N.E.2d 722. Dayton Walther asserted at trial, however, that the evidence was not material, not relevant, not probative, and was introduced *only* for the purpose of inflaming the prejudice of the jury. Questions which are not specifically raised by the objections offered at trial cannot be considered on appeal. *Reed v. Trainor,* (1968) 142 Ind.App. 192, 233 N.E.2d 685.

Dayton Walther has not demonstrated error in the admission of the testimony.

*Issue Three*

 Dayton Walther maintains that the trial court erred when it refused to read Dayton Walther's tendered instruction informing the jury that it could not award damages for emotional difficulties of Rhonda Caldwell resulting from the loss of her brother and friend in the collision.

The trial court did read the following instruction:

"If you find for the plaintiff, Rhonda Caldwell on the question of liability, on either legal paragraph of her complaint, then you must determine the amount of money which will fairly compensate her for any element of damages proved by the evidence to have resulted from the fault of one or more defendants. You may consider (a) the nature and extent of her injuries; (b) whether the injuries are temporary or permanent; (c) the physical pain and mental suffering experienced in the past and reasonably certain to be experienced in the future *as a result of. the injuries* ; (d) physical disfigurement or deformity resulting from the injuries; (e) the plaintiff's ability or inability to have and to enjoy the pleasures of life that only those who are possessed of sound body and free use of its members can enjoy.

You are to determine whether these elements of damage have been proved, by a consideration of the evidence relating to damages. Your verdict must be based on the evidence, and not on guess or speculation. Testimony on the monetary value of pain, suffering, disfigurement or deformity is not needed, however, for the jury to put a monetary value on such elements." (Our emphasis)

Dayton Walther argues:

". . . It is well established that it is reversible error for a court to refuse to instruct on an essential specific element of a case when there has been evidence supporting it, and when it is consistent with the theory of the case, and only a general instruction has been given in that area of law: *Jackman v. Montgomery* (1974), 162 Ind.App. 558, 320 N.E.2d 770; *Barnes v. Deville* (1973), 155 Ind.App. 387, 293 N.E.2d 54; *Baltimore, etc. R. Co. v. Peck* (1913), 53 Ind.App. 281, 101 N.E. 674."

In *Jackman, supra,* the trial court refused an instruction concerning an automobile driver's duty to keep a lookout for other travelers on the highway. No instruction given had provided a definition of lookout.

In *Barnes, supra,* the trial court refused an instruction which explained that the knowledge required as an element of wanton misconduct could be either actual or constructive. The various instructions given did not explain that the knowledge could be constructive.

In *Peck, supra,* Peck alleged that the railroad company had permitted a fire to escape from its right of way and damage Peck's property on or about October 1, 1908. Evidence was introduced suggesting that Peck's property had been damaged early in September 1908. The trial court refused instructions directing the jury to find in favor of the railroad company if the jury determined (a) that the railroad company set its fire October 1, 1908, and (b) that Peck's property was damaged prior to that date.

In the case at bar, however, the trial court did instruct the jury concerning the elements for which Rhonda Caldwell could recover damages. Dayton Walther does not challenge the propriety of that instruction. Instead, it contends that the trial court should also have instructed the jury concerning the elements for which Rhonda Caldwell could not recover damages. While the reading of such an instruction would not necessarily have constituted error, we decline to impose a duty to read such a negative instruction when the jury has been properly instructed on the positive aspects of the same issue. See *Richmond Gas Corp. v. Reeves,* (1973) 158 Ind.App. 338, 302 N.E.2d 795. We must presume that the jury obeyed the instruction given. Dayton Walther has failed to cite authority on point for the proposition that refusal to give the negative instruction constituted error.

*Issue Four*

■ Dayton Walther asserts that the trial court erred in refusing to read the following instruction:

"No evidence has been presented concerning any lost earnings or as to the future earning capacity of Rhonda Caldwell or its diminishment. Accordingly, I instruct

you as a matter of law you may not consider as an element of damages any losses of earnings or any loss of future earning ability which may have occurred, since that would involve impermissible speculation on your part."

We incorporate our statements made in regard to Issue Three. Additionally, in *Cooper v. High*, (1974) 262 Ind. 405, 410, 317 N.E.2d 177, 180, the trial court had refused an instruction which provided, ". . . Neither may you assess damages against the defendants for attorneys['] fees, trial preparation, or court costs, which plaintiff may have incurred. . . ." (Our insertion) Our Supreme Court held:

> "No evidence was presented at the trial as to the attorneys['] fees, trial preparation or court costs. It would have been improper, therefore, for the trial court to give this instruction. . . ." (Our insertion)

\*　　\*　　\*　　\*　　\*　　\*

*Issue Six*

■ Dayton Walther argues that the trial court erred in refusing to read its tendered instruction concerning recovery for future medical complications. This is another negative instruction. We incorporate our statements made in regard to Issue Three. Furthermore, by reading the instruction the trial court would have usurped the jury's duty of weighing the evidence.

\*　　\*　　\*　　\*　　\*　　\*

*Issue Eight*

■ Dayton Walther maintains that the trial court erred when it ordered a separate trial for the issues raised in the third party complaints filed by Dayton Walther against Campbell. Essentially, Dayton Walther insists that Ind.Rules of Procedure, Trial Rule

14(C) [4] controls in the case at bar rather than T.R. 42(B); [5] since Campbell did not request a separate trial until after Campbell filed its responsive pleading, Dayton Walther insists that the trial court was powerless to order a separate trial.

The construction which Dayton Walther imposes upon the procedural rules could lead to obvious problems and absurd results. If its reasoning were adopted, for example, a third party could *prevent* the trial court from ordering a separate trial simply by filing a motion for a separate trial the day after it filed its responsive pleading. We decline to construe the rules in such a manner.

Dayton Walther cites *City of Elkhart v. Middleton*, (1976) 265 Ind. 514, 356 N.E.2d 207. The Supreme Court held therein that the trial court had erred in denying a motion to implead a third party. In the case at bar, the trial court permitted Dayton Walther to file its third party complaints but then determined that the issues raised by the third party complaints should be tried separately.

We agree that *Middleton, supra*, is helpful, however, despite the difference in facts. At page 521 of 265 Ind., at page 212 of 356 N.E.2d, Justice Prentice wrote:

> "Impleader is basically a procedural device of expedience, but since *certain circumstances cause it to fail in its purpose; i. e., when the addition of a party could contribute more problems than it would eliminate or alleviate*, it is clear that a party cannot have his third-party claims adjudicated in the same action as of right. It is appropriate, therefore, for a trial court to consider the relative advantages of impleading a third-party as

---

**4.** "(C) Severance—Parties improperly impleaded. With his responsive pleading or by motion prior thereto, any party may move for severance of a third-party claim or ensuing claim as provided in this rule or for a *separate trial thereon*. If the third-party defendant is a proper party to the proceedings under any other rule relating to parties, the action shall continue as in other cases where he is made a party. \*　\*　\*" (Our emphasis)

**5.** "(B) Separate trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury."

against *the disadvantages which might result such as delay and complication of the trial, and the possibility that the plaintiff, third-party defendant, or both might be prejudiced. . . ."* (Our emphasis)

T.R. 42(B) provides:

"(B) Separate trials. The court, *in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy,* may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury." (Our emphasis)

The fact that the trial court permitted Dayton Walther to file its third party complaints did not prevent the trial court from reassessing the complexity of the causes of action after pretrial conferences had clarified the claims and issues.

The trial court ordered a separate trial after determining that the indemnification question would present too many complications at trial on the original complaints. Portions of the evidence introduced with regard to the third party complaints would require instructions to the jury limiting its use of the evidence; the third party complaints would introduce new questions of privity; the nature of evidence which Campbell would need to present would depend upon whether the Caldwells recovered against Dayton Walther on their theory of negligence, theory of products liability, or both. The trial court could reasonably have found that an attempt to present such a complex case to the jury would cause prejudice to *all* of the parties.

We commend the trial court for its superb efforts in overseeing the pre-trial proceedings. The record portrays admirably the conscientious and persistent efforts of the trial court to promote an expeditious and orderly completion of the litigation.