**James Daniel MITCHELL, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 89S00–8607–CR–632.

Supreme Court of Indiana.

March 10, 1989.

Terrance W. Richmond, Milan, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

James Daniel Mitchell appeals his conviction after a jury trial for the murder of James Thomas. Ind.Code § 35–42–1–1(1) (Burns 1985 Repl.). The trial court sentenced him to 40 years in prison. We affirm.

Mitchell raises seven issues in this direct appeal:

I. Whether the trial court abused its discretion by requiring continued deliberations after the jury twice informed the court it was "deadlocked";

II. Whether delivering exhibits to the jury after twice declining to do so was error;

III. Whether it was error to withhold from this delivery four exhibits not admissible for the truth of their contents;

IV. Whether giving limiting instructions concerning these same four exhibits *sua sponte* was error;

V. Whether the trial court improperly limited the cross-examination of State's witness Ronald DeLucio;

VI. Whether a police detective can be permitted to relate his conclusions about the probative value of evidence; and,

VII. Sufficiency of the evidence.

The evidence at trial was that Mitchell contacted Ronald DeLucio about a "scam deal." Mitchell, who had known DeLucio for several years, asked DeLucio to travel from his home in Houston, Texas. He did not describe details about the plan, but wired DeLucio enough money for a flight to Indianapolis.

When DeLucio arrived at the Indianapolis airport on February 6, 1982, he was met by Mitchell and by James and Bonnie Thomas, targets of the scheme. Mitchell told DeLucio more about the plan in an airport restroom. DeLucio was to pose as a jewelry courier who could double the Thomases' financial contribution to the scheme.

Upon arrival at the Thomas residence in Richmond, James Thomas placed a sack of money on a living room table. Thomas said the sack contained $15,000. Mitchell took the money and put it in his briefcase. He then left the group and went to the bathroom. When Mitchell returned, he shot at James and Bonnie Thomas. They died from multiple gunshot wounds. The jury found Mitchell guilty of killing James and acquitted him of killing Bonnie.

## I. *Jury Deliberations*

Mitchell argues that Judge Robert Reinke should have discharged the jury and declared a mistrial after the jury twice informed the court that it was deadlocked. The record is unclear about the period of time the jury deliberated.

During its deliberations, the jury passed several notes to the court. The first note requested exhibits be sent to the jury room. The next note stated:

Janice [the bailiff] our deliberations have come to a standstill. We are at the point of a deadlock. If possible we need instruction from the Court.

The judge informed the jury that he could not respond to that general inquiry, but would consider any specific question or request. Finally, they sent a note saying:

We have reviewed testimony in evidence again. We cannot come to a unanimous decision, [sic] we are deadlocked.

After this last note, the trial court sent exhibits to the jury room.

The Indiana Code commits decisions concerning discharge to the discretion of the trial court: "The jury may be discharged by the court ... after they have been kept together until it satisfactorily appears that there is no probability of their agreeing." Ind.Code § 34–1–21–7 (Burns 1986 Repl.). Judge Reinke exercised proper discretion in declining to discharge the jury.

## II. *Sending Exhibits to Jury Room*

Mitchell argues that the court intimidated or coerced the jury by sending certain exhibits to the jury room after the members indicated twice they were deadlocked. Mitchell further argues the trial court erred by not rereading all final instructions in response to the jury's inquiry.

■ Mitchell's first argument compares the trial court's actions to an "Allen charge." An "Allen charge" is the name given to a supplemental instruction by a trial judge to an apparently deadlocked jury. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Such a charge is reversible error when it unduly intimidates or coerces a jury. *See Lewis v. State* (1981), Ind., 424 N.E.2d 107.

Decisions about providing exhibits to the jury are within the trial court's discretion. *Thomas v. State* (1972), 259 Ind. 537, 540, 289 N.E.2d 508, 509 (§ 5.1 of ABA Standards Relating to Trial by Jury "the best rule").

The trial court supplied all the appropriate exhibits, reducing chances for undue emphasis on certain exhibits. Further, the trial court carefully cautioned the jury about its decision to provide exhibits, saying:

> I've received your communication Mr. Foreman concerning the status of your deliberations and having considered it it's the opinion of the Court that it might assist you in your deliberations if you were to receive certain of the exhibits which have been admitted as evidence in this case. So what I will do is send certain of these exhibits back with you and ask that you continue your deliberations further in the hope that you might be able to reach a unanimous verdict. . . .

In this circumstance, sending certain exhibits to a jury does not carry the level of coercion of an Allen charge. We find no coercion and conclude that the trial court acted within its discretion.

■ Mitchell argues that the trial court should have reread all final instructions upon *any* inquiry from the jury. He cites *Crowdus v. State* (1982), Ind., 431 N.E.2d 796 (giving supplemental instruction reversible error), and *Cornett v. State* (1982), Ind., 436 N.E.2d 765 (sending jury instruc-

tions containing extraneous markings reversible).

Mitchell cites language in *Cornett* saying instructions must be reread for *"any type of problem." Cornett* 436 N.E.2d at 766 (emphasis in original).[1] The rule then prevailing held sending instructions to the jury room error, although not *per se* reversible, and required that the trial court reread all final instructions. *Jameison v. State* (1978), 268 Ind. 599, 377 N.E.2d 404; *Mullins v. Bunch* (1981), Ind., 425 N.E.2d 164. Under current law, it is not error to send final instructions to the jury room if they have first been read in open court. *Wood v. State* (1987), Ind., 512 N.E.2d 1094.

■ Clearly, our new rule allowing "cleansed" instructions to be sent to the jury room at the trial court's discretion, once the instructions have been read, supersedes the advice of *Cornett.* A court deciding to reread final instructions should read all of them to prevent undue emphasis. Likewise, if a court decides to send final instructions to the jury room, it should send all final instructions.

### III. *Withholding Certain Exhibits*

■ Mitchell argues that exhibits 14, 15, 16 and 17 were erroneously excluded from the exhibits sent to the jury room. These exhibits were copies of folders and documents from Richmond Police Department investigatory files and a partial transcript of grand jury testimony on the murder of James and Bonnie Thomas. They were seized by the State from Mitchell's possession.

Initially, we must consider whether Mitchell waived this issue by failing to make a timely objection. Mitchell had earlier objected to limiting instructions on the exhibits. He also objected to any and all exhibits going to the jury room. The trial court then reviewed each exhibit that

---

1. Clearly, rereading the final instructions has never been the sole solution to *any* problem or inquiry from the jury. *See Ortiz v. State* (1976), 265 Ind. 549, 356 N.E.2d 1188 (on the jury's request, court must have read to them any properly admitted testimony or documentary evi-

dence); *Shaffer v. State* (1983), Ind., 449 N.E.2d 1074 (error to replay virtually all evidence given during trial); *Wilder v. State* (1986), Ind.App., 498 N.E.2d 1295 (jury which requests a videotape be replayed may be accommodated).

would be sent, not mentioning exhibits 14, 15, 16 and 17. After this announcement, the trial court asked Mitchell's attorney for any comments. Mitchell did not object at this point or at any other time.

Mitchell further argues that there was no opportunity to object, citing *Kennedy v. State* (1972), 258 Ind. 211, 280 N.E.2d 611 and *Long v. State* (1983), Ind.App., 448 N.E.2d 1103. In the case at bar, however, Mitchell did have an opportunity to object to the exclusion of exhibits 14, 15, 16 and 17 outside the presence of the jury. Mitchell waived this issue.

### IV. *Instruction Given Sua Sponte*

Mitchell argues that the trial court erroneously instructed the jury on the limited purpose of exhibits 14, 15, 16 and 17. Mitchell asserts that this was error because the instruction was given *sua sponte*, and because the instruction was confusing and contradictory.

■ Exhibits 14, 15, 16 and 17 were not included in the record on appeal. While failing to include exhibits may waive an issue, here it does not. Mitchell does not contest the substantive issue of whether these exhibits are hearsay. Mitchell's claim of error focuses on whether the trial court may give this instruction on these exhibits *sua sponte*. This issue does not demand an examination of the exhibits. The instruction at issue informed the jury that these exhibits, police investigatory files and grand jury testimony, should not be considered as proof of any of the facts contained in the exhibits. The court instructed the jury that the exhibits could be deemed as proof only of the defendant's possession of the items.

■ Mitchell relies on the legal principle that when no limiting instruction is tendered, and the trial court gives none, the evidence received by the jury may be considered for all purposes, citing *Grove v. State* (1983), Ind.App., 449 N.E.2d 1122. That principle, though, provides only partial guidance concerning a trial court's decision to give *sua sponte* a limiting instruction on hearsay exhibits. The full answer is provided by *Hudgins v. State* (1983),

Ind., 451 N.E.2d 1087. Action taken *sua sponte* does not automatically constitute advocacy by the court. A court is not required to allow improper procedures regardless of the absence of objections. *Id.* at 1090. We find that it was appropriate for the court to act *sua sponte*.

### V. *Limitation of Cross Examination*

■ Mitchell argues that the trial court erroneously limited the cross-examination of Ronald DeLucio, called by the State to provide testimony describing Mitchell's shooting of James and Bonnie Thomas.

The following questions were asked by Mitchell's attorney and answered by DeLucio:

Q. So everybody in your family knew that you were coming to Wayne County [Richmond] to open up a safe, true?
A. Yes.
Q. Had you done that before?
A. What open a safe?
Q. Yes.
A. Yes.
Q. Illegally?
A. Yes.
Q. For whom?
A. Myself.
Q. What do you mean for yourself?
MR. SURFACE [Prosecutor]: I'm going to object to the line of questioning Judge. I think it goes beyond the *Ashton v. Anderson*—
THE COURT: I'll sustain that.
MR. BACKMEYER [Mitchell's attorney]: May I respectfully—his criminal conduct we can't go into?
THE COURT: No.

Mitchell claims that further questioning would have served to impeach DeLucio's credibility by showing that DeLucio either lied to his family about his purpose in going to Richmond or lied to police about the true reason he had come to Richmond. Mitchell asserts this was a denial of due process.

The record reveals, however, that defense counsel later questioned DeLucio about the same subject, leading DeLucio to state that he had lied to his wife about his

trip to Richmond because he did not want her to become involved. Having succeeded in eliciting the very testimony he claims was prohibited earlier in the trial, Mitchell presents no basis for reversal.

### VI. *Testimony on a Legal Conclusion*

■ Mitchell argues that the trial court erred by permitting Officer Jack Myers to testify on whether various items of evidence had probative value. Myers is a police officer for the City of Richmond who assisted in the investigation of James and Bonnie Thomases' murders. Mitchell's attorney questioned Myers on direct examination, attacking the methodology of the investigation. On cross examination, the prosecutor responded to this attack by asking Myers whether various items of evidence had probative value. Mitchell argues that the trial court erred by permitting this line of questioning. Mitchell asserts that this testimony invaded the province of the finder of fact, to his prejudice.

Whether evidence has probative value is a legal conclusion about the quality of a piece of evidence. Evidence has "probative value" if it has a tendency to prove a fact in issue even though that tendency is exceedingly slight. *See Collins v. State* (1981), Ind.App., 422 N.E.2d 1250; *Henry v. Oberholtzer Construction Corporation* (1965), 138 Ind.App. 7, 211 N.E.2d 194. Whether a piece of evidence has probative value is part of the legal equation that determines whether it is admissible evidence. After the evidence is admitted in court, the fact finder may examine it and assess its weight and credibility to reach a verdict. *See generally McCormick on Evidence* § 184 (E. Cleary 3d ed.1984).

Any evidence admitted by the trial court should, by definition, have some probative value. The province of the jury is to assess the *amount* of probative value after the trial court has made the threshold legal decision that a piece of evidence has probative value and is admissible. It is inappropriate, then, for a witness to testify that a piece of evidence does or does not have probative value because that legal decision has already been made.

The record contains more than 40 pages of questions which the prosecutor put to Officer Myers on cross-examination. Samples of that exchange follow:

Q. What probative value did a .22 caliber revolver have in identifying James Daniel Mitchell as the killer of James and Bonnie Thomas?

A. None.

Q. You found a partial box of Federal .25 caliber ammunition, did you have that tested?

A. No sir.

Q. Why not? It had no probative value did it?

A. No sir.

Q. And you found a .22 box of Remington long rifle shells (sic) did you have that tested?

A. No sir.

Q. And again it had no probative value?

A. No sir.

\* \* \* \* \* \*

Q. I'm going to hand you Defendant's Exhibit P a photograph that has been admitted and passed to the jury and I ask you in your decision making authority did that photograph have any probative value in your judgment in linking James Daniel Mitchell to the deaths of the Thomases?

A. None.

A witness qualified as an expert in criminal investigations may give his opinion on why evidence was tested or not tested, but he may not testify on the legal conclusion of whether evidence has probative value. Allowing such testimony is error.

The trial court, however, repeatedly instructed the jury that the witness's testimony related only to his opinion of probative value. The trial court also instructed the jury four times on how to use Myers's testimony on probative value. The trial court's most formal limiting instruction was:

[T]estimony of the witness Myers as to whether a particular item had probative value is not admissible for the truth of the matter asserted. That is it is not admissible to prove whether the particu-

lar item in fact had probative value. Such testimony is admissible solely to explain the subsequent conduct of the witness and other law enforcement personnel regarding the particular item. This instruction and the three other similar instructions sufficiently and repeatedly informed the jury about the import of this testimony.[2] While admitting the testimony was error, it was harmless.

## VII. *Sufficiency of the Evidence*

 Mitchell argues that the evidence insufficiently supports the conviction. He relies on the apparent contradiction in the jury's verdict of guilt for the murder of James Thomas but acquitting him for the murder of Bonnie Thomas.

Mitchell argues that the evidence, particularly DeLucio's testimony, is inherently incredible and that it constitutes mere suspicion and conjecture. He asserts that the uncorroborated testimony of DeLucio is not enough because DeLucio was equivocal and there is no supporting circumstantial evidence.

To review claims of insufficient evidence, we do not weigh the evidence or judge credibility. We consider only the evidence most favorable to the verdict and all reasonable inferences therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact, the verdict will not be overturned. *Alfaro v. State* (1985), Ind., 478 N.E.2d 670. The testimony of one eyewitness is sufficient to convict. *Greenlee v. State* (1984), Ind., 463 N.E.2d 1096.

Basically, Mitchell's claims are addressed to the credibility of DeLucio, the State's key witness. This Court has reversed convictions because the uncorroborated testimony of one witness was so incredible. *Gaddis v. State* (1969), 253 Ind. 73, 251 N.E.2d 658. In that case, however, the State's witness was equivocal; there was a complete lack of circumstantial evidence, and the testimony was the result of coercion.

The jury could have found that the prosecution coerced DeLucio's testimony. The immunity granted DeLucio and all the facts about that grant were before the jury.

The record reveals little, if any, equivocating by DeLucio. Circumstantial evidence also supported DeLucio's testimony. DeLucio's wife corroborated, among other things, that he took a flight from Houston on a Friday in February, and he received money from Mitchell through Western Union. The Western Union receipt is included in the record and includes the name of the sender, "J.D. Mitchell, 1911 Straightline Pike, Richmond, Indiana 47374." In evidence also are the Western Union checks made payable to Ron DeLucio. The evidence does not have any traits of inherent incredibility and is far more than mere suspicion or conjecture.

We affirm the trial court.

DeBRULER, GIVAN and DICKSON, JJ., concur.

PIVARNIK, Justice, dissenting.

I must dissent from the majority in its affirmance of the trial court's judgment. The trial court committed reversible error in the manner of communication with the jury during deliberations.

We must first examine an incident during trial concerning certain items of evidence which Defendant Mitchell offered into evidence. Mitchell's exhibits 14, 15, 16, and 17 were copies of folders and documents from the Richmond Police Department investigation files, and a partial transcript of grand jury testimony on the murder of James and Bonnie Thomas. The State seized these items from Mitchell's possession. Mitchell offered exhibits 14, 15, 16, and 17 into evidence and the State did not object. The court then admitted these exhibits into evidence; defense counsel then moved for permission to pass these exhibits to the jury for their observation. Again the State did not object. This occurred at the end of the day's proceedings.

---

**2.** An alternative remedy by the trial court would have been to request the prosecutor and witness to refrain from the use of the term "probative value." That would have properly focused the cross-examination on the witness's opinions.

When the trial continued the next morning, the trial judge *sua sponte* gave the jury a rather lengthy limiting instruction, explaining that the content of these exhibits was hearsay and they were not to be considered as evidence, but merely considered for the limited purpose of determining whether the police seized them from Mitchell's possession. Mitchell objected to this limiting instruction, claiming once the exhibits had been admitted into evidence without objection they became substantive evidence for all purposes and were not subject to such limitations. Over Mitchell's objections, the court, on three occasions, gave this limiting instruction as the jurors viewed the exhibits.

Mitchell correctly contends that where incompetent evidence, hearsay or otherwise, is admitted without objection, its probative value is for the trier of fact to determine, notwithstanding the fact that evidence might have been excluded if a proper and timely objection had been made. *Dayton Walther Corp. v. Caldwell* (1980), 273 Ind. 191, 200, 402 N.E.2d 1252, 1257; *Kern v. State* (1957), 237 Ind. 144, 147–48, 144 N.E.2d 705, 706–07. Although Mitchell does not raise the question of the prejudice occasioned him due to the court's limiting the probative value of these exhibits, the court's action becomes significant in the context in which the court used these exhibits, and others, at the time of the jury's deliberations.

Although the jury was permitted to take the court's final instructions to the jury room, none of the exhibits were sent at the beginning of deliberations. One of these final instructions taken in concerned Mitchell's exhibits 14, 15, 16, and 17, about which the court again limited the probative weight given those exhibits. In any event, during the course of deliberations, the court received the following request from the jury:

We need please pictures of one, bodies on couch, all; two, cigarette burns on couch; three, burn on Bonnie's hip; four, picture of feet; five, Western Union receipt showing money sent; six, clipboard; seven, deposition of DeLucio.

The trial judge convened with counsel and had a hearing on the matter. Mitchell objected to sending any exhibits to the jury. The State had no objection to complying with the request but proposed the court send all exhibits except the deposition and statement, and exhibits 14, 15, 16, and 17. The judge took the matter under advisement temporarily and later reconvened with counsel, heard counsel restate their positions as they had before, and decided at that time he should not give the DeLucio deposition to the jury. Exercising his discretion, in view of the volume of the exhibits, he stated he would not give any to them at that time. The judge then sent to the jury this response: "You cannot receive the items you request." Later, the jury sent a message through the bailiff that they feared they were hopelessly deadlocked and doubted they could reach a verdict. The court again convened counsel with the same results. The defense objected to any exhibit going to the jury room and the State proposed all exhibits go except the statement, the deposition, and exhibits 14, 15, 16, and 17. The court determined it would not respond to the jury at this time. Still later the court received another note from the jury indicating: "We have reviewed testimony in evidence again. We cannot come to a unanimous decision, we are deadlocked."

The court again inquired of counsel as to their positions regarding sending exhibits to the jury room. Mitchell again, for the third time, indicated his objection. The State indicated it would agree to the exhibits going back to the jury. The trial judge then indicated he would send the jury all exhibits except the statement, DeLucio's deposition, and exhibits 14, 15, 16, and 17. In doing so, he called the jury into open court and gave them the following instruction:

I have received your communication, Mr. Foreman, concerning the status of your deliberations, and having considered it its the opinion of the court that it might assist you in your deliberations if you were to receive certain of the exhibits which have been admitted as evidence in this case. So what I will do is send

certain of these exhibits back with you and ask that you continue your deliberations further in the hope that you might be able to reach a unanimous verdict. After the exhibits were sent to the jury with the judge's comments, the jury returned with a guilty verdict.

The effect of the trial judge's actions in this case, as Mitchell aptly contends, created the same impression on the jury found objectionable in the *"Allen"* charge. *Allen v. United States* (1896), 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528; *Lewis v. State* (1981), Ind., 424 N.E.2d 107. The *Allen* charge had the effect of telling the jury it was imperative they reach a verdict to resolve the pending matter and prevent incurring further time and expense in trying the cause all over again. The *Allen* charge has been rejected as improper and oppressive to a jury in *Lewis*, 424 N.E.2d at 109–12, and succeeding cases in this jurisdiction and many others. As in *Allen*, in this case the harm was in the judge telling the jury they must reach a verdict when, in fact, there was no such compulsion. In feeling they were mandated to do so, they were compelled to compromise their determination of facts and conclusions. Such a compromise may very well have resulted in prejudice to Mitchell. There is no way of knowing where and how many of such compromises the jury might have made, and what effect they had on the guilty verdict to the extent that reversal and a new trial are justified.

In *Lewis*, this Court held the procedure to follow in responding to the problem we are presented with is for the court to call the jury back into open court and, in the presence of all the parties and their counsel if they desire to be there, reread all instructions given them prior to their deliberations, without emphasis on any of them and without further comment. *See also Crowdus v. State* (1982), Ind., 431 N.E.2d 796, 798; *Cornett v. State* (1982), Ind., 436 N.E.2d 765, 766. That specific issue is not presented here since the final instructions were read to the jury in open court and sent back to the jury room with them. The situation here is that the jury asked that certain exhibits be furnished to aid them in their deliberations, and indicated they were seriously deadlocked. It is significant the jury decided they needed to examine these particular exhibits to help resolve the conflicts in their deliberations.

Clearly, it is within the discretion of the trial court to furnish exhibits to the jury when so requested. *Roland v. State* (1986), Ind., 501 N.E.2d 1034, 1040. This rule was established and well stated in *Thomas v. State* (1972), 259 Ind. 537, 289 N.E.2d 508, in which this Court held the trial court may in its discretion permit the jury to take an exhibit into the jury room during deliberations considering whether the exhibit will aid the jury in proper consideration of the case, whether either party will be prejudiced, and whether the exhibit may be subjected to improper use by the jury. *See also Hughes v. State* (1987), Ind.App., 508 N.E.2d 1289, 1304; *State v. Harden* (1986), Ind., 496 N.E.2d 35, 36–37; *Torres v. State* (1982), Ind., 442 N.E.2d 1021, 1025–26; *Jackson v. State* (1980), 274 Ind. 297, 302–03, 411 N.E.2d 609, 613. It is doubtful the trial court in the instant case would have been found to have abused its discretion had it furnished the jury the particular exhibits they requested. However, the court refused to furnish the jury the specific exhibits they requested.

Finally, after two reports from the jury that it was hopelessly deadlocked and would be unable to reach a verdict, the court decided, over Mitchell's objections, and at the State's suggestion, to send certain exhibits to the jury which the court selected as those which might aid the jury. Although the exhibits sent to the jury apparently included the ones they specifically requested, they did not include all of the exhibits in the case, and specifically did not include Mitchell's own exhibits 14, 15, 16, and 17.

This constituted reversible error in that the court placed undue emphasis on certain exhibits to the exclusion of others. The court went on to instruct the jury as follows: "It might assist you in your deliberations if you were to receive certain of the exhibits which have been admitted as evi-

dence in this case." These certain exhibits enabled the jury to break its deadlock and bring in a guilty verdict against Mitchell. In view of these circumstances, I would reverse the trial court judgment and order a new trial for Mitchell.