JoAnn ALEXANDER and Jack
Alexander, Appellants
(Plaintiffs Below),

v.

D. Kevin SCHEID, M.D. and Ortho-
paedics Indianapolis, Inc., Appel-
lees (Defendants Below).

No. 49S05–0004–CV–231.

Supreme Court of Indiana.

April 3, 2000.

Morris L. Klapper, G.R. Parish, Jr., Indianapolis, Indiana, Attorneys for Appellants.

Kevin C. Schiferl, Sandra Boyd Williams, Indianapolis, Indiana, Attorneys for Appellees.

## ON PETITION TO TRANSFER

BOEHM, Justice.

The plaintiffs are a married couple who allege medical malpractice in the failure to follow up on a chest x-ray that revealed a nodule in the wife's lung. When the complaint was filed, the wife had incurred an increased risk of fatal cancer as a result of the delay in diagnosis, but was in remission. This case addresses whether a claim for medical malpractice may be asserted if the injury has not come to its full potential, and may never do so. We conclude that such a claim may be pursued under the circumstances of this case.

### Factual Background

In June of 1993, sixty year-old JoAnn Alexander was scheduled for hip surgery by Dr. D. Kevin Scheid, an orthopedic surgeon at Orthopaedics Indianapolis, Inc. (Orthopaedics). Scheid ordered a chest x-ray, which was required at his office for patients over the age of sixty to ensure the strength of their lungs to undergo anesthesia. The x-ray was administered on the 24th of that month and revealed a density

in the upper right lobe of her right lung. The neuroradiologist generated a report of the x-ray and sent a hard copy of the report to Scheid's office. He also recorded the results of the x-ray into a phone dictating service, which made them available to Scheid's office for approximately four to five days. The report of the results was placed in JoAnn's chart at Scheid's office, but neither Scheid nor his office took any action, despite the fact that the report noted a "density . . . in the upper lobe" and concluded that "comparison with old films would be of value."

In the spring of 1994, JoAnn began spitting up blood and went to another doctor. A second chest x-ray revealed a large mass on the upper right lobe of the right lung. In May, after a biopsy, JoAnn was diagnosed with non-small cell lung cancer. Efforts to remove the tumor were not completely successful, and, because the cancer had metastasized to one lymph node in her chest and to the bronchial margin, it was not curable. After JoAnn underwent extensive chemotherapy and radiation treatment, her condition went into remission in approximately October 1994.

### Procedural History

Pursuant to the Medical Malpractice Act,[1] on December 22, 1994, the Alexanders filed a proposed complaint with the Indiana Department of Insurance. The Medical Review Panel issued its opinion on August 26, 1996, unanimously finding that:

(1) The evidence supports the conclusion that Defendants D. Kevin Scheid, M.D. and Orthopaedics Indianapolis, Inc. failed to comply with the appropriate standard of care as charged in the Complaint.

(2) The conduct complained of was a factor of the resultant damages in that the failure to follow-up on the June 24, 1993 x-ray report resulted in a 10–month delay of the diagnosis of Plaintiff's lung cancer.

On October 8, 1996, the Alexanders filed an amended complaint in Marion Superior Court. In Count I, they alleged that Scheid and Orthopaedics were negligent in failing to follow up on JoAnn's chest x-ray, and that this negligence resulted in the following harms to JoAnn: (1) "serious and permanent injuries necessitating extensive additional medical care"; (2) an increased risk of harm and decreased chance for long-term survival (later dubbed "loss of chance"), including the loss of "the possibility of successful removal of the tumor"; (3) "the incurrence of substantial medical expenses" and "loss of earning capacity"; and (4) severe emotional distress. In Count II, Jack Alexander alleged loss of consortium. JoAnn asserts that in the months following her first x-ray but preceding her diagnosis with lung cancer her injuries included: (1) deterioration of her overall health, including exhaustion, pneumonia-like symptoms, and feeling "run-down" in general; (2) spitting up blood; (3) an exacerbation of cancer, i.e., an increase in the size of the tumor and metastasis to one lymph node and the bronchial margin, resulting in cancer that is either incurable or at a minimum has a significantly lower probability of being treatable; and (4) damage to healthy lung tissue and lung collapse.

Three doctors were deposed regarding JoAnn's comparative prognoses in June 1993 and May 1994. In capsule form, they presented admissible evidence that (1) JoAnn's cancer was likely in Stage I at the time of the first x-ray but had advanced to Stage IIIa before it was diagnosed; and (2) the probability of her long-term survival was significantly reduced over that period of time.[2] Scheid and Orthopaedics

---

1. Indiana Code §§ 27–12–10–1 to 26 (1993). The Medical Malpractice Act has since been recodified at Indiana Code §§ 34–18–1–1 to 10–26.

2. The doctors' estimations of the chances of JoAnn's survival for five years from diagnosis ranged from 10 to 30%. Even if JoAnn survived for five years, Dr. Scott Saxman testified, she would not be free from the risk of a relapse. Dr. Fred O. Butler testified that, if

moved for summary judgment, arguing that, in view of JoAnn's remission, JoAnn had suffered no present compensable injury, and therefore, as a matter of law, had no claim. The trial court agreed and the Court of Appeals affirmed, concluding that: (1) Section 323 of the Restatement of Torts does not allow recovery for wrongs that increase the risk of harm unless the harm has come to pass; (2) JoAnn was not presently injured physically; and (3) in the absence of a physical injury, the modified impact rule does not apply to allow JoAnn to recover for negligent infliction of emotional distress. *See Alexander v. Scheid,* 696 N.E.2d 491 (Ind.Ct.App.1998) (mem.).

This case raises four questions. · (1) Does Indiana law permit JoAnn to recover for an increased risk of incurring a life shortening disease under the "loss of chance" doctrine or otherwise? (2) If so, what is the appropriate measure of damages? (3) Has JoAnn suffered an impact that would allow her to recover for negligent infliction of emotional distress under the "modified impact rule?" (4) May JoAnn maintain a cause of action for the aggravation to date of her lung cancer?

### Standard of Review

On appeal, the standard of review of a summary judgment motion is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Shell Oil Co. v. Lovold Co.,* 705 N.E.2d 981, 983–84 (Ind.1998). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Shell Oil,* 705 N.E.2d at 983–84. The review of a summary judgment motion is limited to those materials designated to the trial court. *See* T.R. 56(H); *see also Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993). Here, the designated evidence includes depositions of physicians that establish the factual predicates on which the Alexanders rely to defeat summary judgment.

### I. Decreased Life Expectancy

A. *Issues Raised under the Rubric "Loss of Chance"*

"Loss of chance," also often referred to as "increased risk of harm" is usually traced back to this frequently quoted passage from *Hicks v. United States:*

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the

JoAnn's cancer were to recur, she would be given palliative rather than curative care. According to Butler, "If she recurs, she will die from this tumor." If, on the other hand, JoAnn's cancer had been diagnosed at the time of the initial x-ray, according to ·Butler, JoAnn would have had approximately a 60 to 80% chance of a full recovery from lung cancer.

Saxman estimated that there was only a 13 to 22% chance that her cancer had metastasized by the time of her first x-ray, but testified to the uncertainty of determining probability—which he defined as the probability that JoAnn had already suffered some lymph node involvement at the time of the initial x-ray. If she had, then the staging of her cancer would not have progressed during the 11–month period, even though the tumor had grown. He went on to state that staging is not the only indicator of a patient's prognosis, and later testified that, "[t]he larger the primary tumor, the more likely [the patient is] to have lymph node involvement."

Dr. Laurence H. Bates stated that, although it was impossible to know the stage of her cancer at the time of the first x-ray, there was a greater than 50% chance that JoAnn's cancer was in Stage I at the time the first nodule was revealed. According to Bates, in Stage I, "[T]here is a significantly higher likelihood of being able to resect it completely and curing the cancer than there is in the case of stage IIIa cancer." By the time JoAnn was diagnosed with cancer 11 months later, the cancer had progressed to Stage IIIa, and her tumor had approximately quadrupled in size, from one to four centimeters.

defendant has destroyed it, he is answerable.

368 F.2d 626, 632 (4th Cir.1966) (quoted in *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1387 (Ind.1995)). The term "loss of chance" has been applied to a number of related situations. These include: (1) an already ill patient suffers a complete elimination of an insubstantial or substantial probability of recovery from a life-threatening disease or condition [3]; (2) a patient survives, but has suffered a reduced chance for a better result or for complete recovery [4]; and (3) a person incurs an increased risk of future harm, but has no current illness or injury.[5] The first of these was addressed by this Court in *Mayhue*. *See* 653 N.E.2d at 1384. The Alexanders now present the second, which, like the first, typically arises in the context of a claim of negligent health care. The third commonly arises in connection with claims of exposure to toxic substances, where no adverse results have yet emerged.

These cases pose a number of separate but sometimes interrelated issues. First, many courts initially address the issue as one of causation. *Mayhue* took the view that under traditional medical malpractice theory, when a patient's chance of recovering from a disease is already less than fifty percent, it can never be said that the doctor's malpractice was the proximate cause of the ultimate death. *See id.* at 1387. Accordingly, recovery under traditional tort standards of causation is barred under those circumstances. This approach views the injury as the ultimate adverse result of the disease, which may be death, but may also be other conditions (paralysis, blindness, etc.).

**3.** *See DeBurkarte v. Louvar*, 393 N.W.2d 131, 135, 139–40 (Iowa 1986) (affirming trial court's damages award to plaintiff whose chances of surviving breast cancer dropped from 50–80% to no chance whatsoever); *Perez v. Las Vegas Medical Ctr.*, 107 Nev. 1, 805 P.2d 589, 592–93 (1991) (allowing plaintiff who did not have a greater than 50% chance of surviving brain hemorrhage, even in absence of malpractice, to proceed beyond summary judgment); *Evers v. Dollinger*, 95 N.J. 399, 471 A.2d 405, 407–08 (1984) (allowing plaintiff who suffered recurrence of breast cancer between trial and appeal to maintain loss of chance cause of action where doctor's malpractice caused seven-month delay in diagnosis); *Herskovits v. Group Health Cooperative*, 99 Wash.2d 609, 664 P.2d 474, 475–77 (1983) (allowing issue of proximate cause to go to jury where deceased plaintiff's chance of surviving cancer dropped approximately 14%); *see also Mayhue*, 653 N.E.2d at 1384, 1387–89 (allowing husband of deceased wife to proceed with loss of consortium claim, under Section 323 of the Restatement of Torts, even though experts agreed that wife had less than 50% chance of recovery in absence of defendant's alleged malpractice).

**4.** *See James v. United States*, 483 F.Supp. 581, 583, 587 (N.D.Cal.1980) (finding in favor of plaintiff who remained undiagnosed with lung cancer after abnormal chest x-ray was filed away without having been read by examining physician); *United States v. Anderson*, 669 A.2d 73, 78 (Del.1995) (allowing recovery for increased risk of a return of testicular cancer as part of damages award); *Delaney v. Cade*, 255 Kan. 199, 873 P.2d 175, 177–78, 182 (1994) (allowing paraplegic plaintiff to recover where risk of spinal cord injury was increased five to ten percent by prolonged period of shock following car accident and prior to surgery); *Aasheim v. Humberger*, 215 Mont. 127, 695 P.2d 824, 825, 827–28 (1985) (trial court erred in failing to instruct jury on loss of chance where plaintiff claimed that due to defendant's negligence she had lost her chance "to have less radical surgery and preserve her natural knee").

**5.** *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 800 (1993) (concluding that a plaintiff exposed to toxins may recover for fear of contracting cancer in absence of present injury only when cancer is more likely than not to develop); *Eagle–Picher Indus., Inc. v. Cox*, 481 So.2d 517, 525–26 (Fla.Dist.Ct.App.1985) (disallowing recovery for future risk of contracting cancer due to exposure to asbestos); *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 195 (Ky.1994) (disallowing plaintiff recovery for increased risk of contracting cancer in absence of any present harm from exposure to asbestos); *Bryson v. Pillsbury Co.*, 573 N.W.2d 718, 720, 722 (Minn.Ct.App. 1998) (finding summary judgment appropriate on claim of increased risk of future harm where plaintiff had "presented no evidence to quantify her risk of developing cancer" from exposure to a substance used for chemical treatment).

Just as it is difficult to find causation where the harm is already more than likely to occur, it seems odd to speak of a causal relationship between a defendant's act or omission and an as yet unknown ultimate result. Although an act of malpractice may reduce a patient's chances for survival or for obtaining a better result, this is simply a statistical proposition based on the known experience of a group of persons thought to be similarly situated (in JoAnn's case, persons with four centimeter nodes in the lungs). In any given case, however, the plaintiff's ultimate injury either does or does not occur. Thus, if full recovery is awarded based on an appraisal of causation (or greater than fifty percent probability), the plaintiff who later beats the odds may be overcompensated for an injury that never ultimately emerges. Similarly, the plaintiff who has a less than fifty percent chance, but nonetheless does ultimately bear the full brunt of the disease, may be undercompensated.

One way to deal with this problem is to permit multiple suits as different injuries develop,[6] but that approach has several shortcomings, including the generation of multiple litigation and the attendant costs of that litigation.[7] Delaying suit is another possibility,[8] but that fails altogether to compensate for the very real pain and distress that accompanies an uncertain but probable serious or fatal condition.[9] Delaying suit for medical malpractice in Indiana also has a distinct disadvantage. Given the occurrence-based limitations period for Indiana's medical malpractice claims and our holding that the Indiana Constitution prohibits barring only claims that have accrued but are unknowable,[10] a person in JoAnn's shoes may be forever barred if the claim cannot be presented until the disease recurs.

These factors argue in favor of permitting the Alexanders to bring their claims

---

**6.** See Martinez–Ferrer v. Richardson–Merrell, Inc., 105 Cal.App.3d 316, 164 Cal.Rptr. 591, 596 (1980) (allowing plaintiff who originally exhibited side-effects from a drug to sue 16 years later when he developed cataracts, despite concerns regarding splitting causes of action).

**7.** Splitting causes of action is also generally prohibited in Indiana, see Indiana State Highway Comm'n v. Speidel, 181 Ind.App. 448, 452, 392 N.E.2d 1172, 1175 (1979) (citing Roby v. Eggers, 130 Ind. 415, 422–23, 29 N.E. 365, 368 (1891)), and other jurisdictions, see Moattar v. Foxhall Surgical Assocs., 694 A.2d 435, 440 (D.C.1997) (plaintiff may recover for future consequences, including the possibility of metastasis and hastened death, in view of the prohibition against splitting causes of action); Pecorino v. Raymark Indus., Inc., 763 S.W.2d 561, 571 (Tex.App.1988) (noting that Texas prohibits the splitting of causes of action as part of the doctrine of res judicata).

**8.** See Cal.Civ.Proc.Code § 340.2 (West 1982) (statute allows plaintiffs with asbestos-related injuries to sue, inter alia, "within one year after the date the plaintiff first suffered disability"); Ayers v. Jackson Township, 106 N.J. 557, 525 A.2d 287 (1987). In Ayers, a toxic tort case, the Supreme Court of New Jersey emphasized that "neither the single controversy doctrine nor the statute of limitations

... will preclude a timely-filed cause of action for damages prompted by the future 'discovery' of a disease or injury related to the tortious conduct at issue in this litigation." Id. at 300. The court also recognized, however, that even though the plaintiffs exposed to cancer-causing agents would not be precluded from suing once they actually incurred cancer, their inability to prove causation at some distant time in the future might effectively preclude them from recovery. See id. at 308.

**9.** In Ayers, a dissenting Justice argued vigorously that it is patently unfair to deny a person who has suffered an increased risk of harm a remedy, stressing the very real nature of the present injury: "No person in her right mind would trade places with any one of these plaintiffs. Does this not suggest that a person would have to be paid a considerable sum of money, more than that permitted here by the Court, before tolerating the injuries suffered by these plaintiffs?" 525 A.2d at 320 (Handler, J., concurring and dissenting).

**10.** See Martin v. Richey, 711 N.E.2d 1273 (Ind.1999) (concluding that it was unconstitutional to bar a plaintiff from pursuing a medical malpractice claim where she could not have known about her claim before the occurrence-based statute of limitations had run).

now. If this is to be done, however, there are further complexities to address. First, there is disagreement as to the elements of recoverable damages. Some courts purporting to address "loss of chance" allow recovery only for medical expenses, lost earnings, or loss of consortium, *see, e.g., Roberts v. Ohio Permanente Medical Group, Inc.*, 76 Ohio St.3d 483, 668 N.E.2d 480, 484–85 (1996) (in loss of chance cases, damages are recoverable for underlying injury or death). Others have explicitly allowed recovery for what the doctrine's name suggests: the loss of the chance itself, *see United States v. Anderson*, 669 A.2d 73, 76 (Del.1995) (citing cases). If a lost chance is to be compensable, its valuation also presents issues. Damages may be assessed for the full amount of the injury, if the full extent of the physical injury is already known. *See Weymers v. Khera*, 454 Mich. 639, 563 N.W.2d 647, 653 (1997) (citing cases from jurisdictions that assess full damages when plaintiff has established that defendant's negligence increased plaintiff's risk of harm). Other courts have attempted to assess the damages in proportion to the likelihood that the doctor's negligence caused (or will cause) an injury. *See, e.g., McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 475–76 (Okla.1987) (holding, where decedent's fatal heart attack was misdiagnosed as gastritis, that loss of chance damages must be limited to "those proximately caused from a defendant's breach of duty").

Finally, if damages are awardable for the increased risk of an injury that has not yet occurred, the court faces the difficult task of putting a dollar amount on an as yet unknown loss. The Alexanders' claim here presents that issue as to the ultimate recurrence of the cancer. They also assert current injury in the form of the cancer's metastasizing, and the anxiety generated by the prospect of future recurrence.

### B. *Mayhue v. Sparkman*

In *Mayhue*, this Court held that Section 323 of the Restatement of Torts was the appropriate mode of analysis of a claim for injuries that had been sustained (the patient had died), but which were more likely than not to have occurred even in the absence of any negligence (the patient's ultimate injury was more probable than not before treatment). *See* 653 N.E.2d at 1388–89. Section 323, "Negligent Performance of Undertaking to Render Services," states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if,

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Specifically, under Section 323, a jury may consider, "once the plaintiff proves negligence and an increase in the risk of harm, ... whether the medical malpractice was a substantial factor in causing the harm suffered by the plaintiff." *Id.* at 1388. Section 323's formulation, by its terms, presupposes that physical harm has resulted from the negligent care. In *Mayhue*, because the patient had died, the ultimate physical harm was already known. We held that the plaintiff's spouse could, under Section 323, maintain his cause of action for loss of consortium even though the experts agreed that, in the absence of the defendant's negligence, it was still more likely than not that the plaintiff would have died. *See id.* at 1387–89. We distinguished Section 323 from what was dubbed a "pure loss of chance" doctrine, which compensates for the loss of chance itself and not for the plaintiff's physical injury that was incurred but likely even before the defendant's act or omission. In a pure loss of chance case, "[t]he compensable injury is not the result, which is

usually death, but the reduction in the probability that the patient would recover or obtain better results if the defendant had not been negligent." *Id.* at 1387–88. In *Mayhue*, because the plaintiff was seeking damages for loss of consortium that resulted from his wife's death, rather than for the loss of his wife's chance for recovery, we were not faced with whether to compensate a plaintiff for the loss of chance itself.

The defendants argue that in *Mayhue* this Court rejected the loss of chance doctrine, and that, left with Section 323 as their remedy, the Alexanders cannot recover because JoAnn has not yet suffered a recurrence. The Court of Appeals has agreed with this interpretation of *Mayhue*, finding that this Court "specifically rejected" the loss of chance doctrine in favor of Section 323. *See Smith v. Washington*, 716 N.E.2d 607, 614 n. 3 (Ind.Ct.App.1999); *Cahoon v. Cummings*, 715 N.E.2d 1, 6–7 (Ind.Ct.App.1999). The Alexanders, on the other hand, assert that this Court adopted the loss of chance doctrine in *Mayhue*, finding support for this hypothesis in the following language: "Accepting the § 323 approach does not require a *separate* loss of chance doctrine." 653 N.E.2d at 1389 (emphasis in original). According to plaintiffs, the emphasis of the word "separate" signals the incorporation of the loss of chance doctrine into this Court's Section 323 analysis. The plaintiffs contend that, in adopting Section 323, which provides a cause of action when the defendant, by his or her negligence, increases the risk of harm to a plaintiff, this Court has already recognized the viability of a cause of action for the increased risk of harm itself.

*Mayhue* left unresolved the issue presented by the Alexanders' claim. *Mayhue* explicitly pointed out that it dealt with a claim for a patient who had died, allegedly as the result of negligent treatment. Because the patient in *Mayhue* was seriously ill before treatment, the case addressed whether a plaintiff may maintain a cause of action for medical malpractice even though traditional causation standards may not be satisfied. In contrast, here the issue is whether a reduced chance of survival, which mathematically equates to a decrease in life expectancy, is itself a compensable injury. If it is, a plaintiff may recover for this injury, independently of whether the plaintiff has or has not actually beaten the odds to date.

C.   *"Loss of Chance" as an Independent Injury*

■   Causation and injury are sometimes described together as the collective third element of a medical malpractice claim. *See Mayhue*, 653 N.E.2d at 1386–87 (reciting that, in order to prevail in a medical malpractice cause of action, a plaintiff must establish: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; (3) the breach proximately caused the plaintiff's injuries). Causation and injury are distinct, however, and we are confronted with this distinction here.

■   We think that loss of chance is better understood as a description of the injury than as either a term for a separate cause of action or a surrogate for the causation element of a negligence claim. If a plaintiff seeks recovery specifically for what the plaintiff alleges the doctor to have caused, i.e., a decrease in the patient's probability of recovery, rather than for the ultimate outcome, causation is no longer debatable. Rather, the problem becomes one of identification and valuation or quantification of that injury. We view the issue presented by JoAnn's claim as whether a plaintiff may recover for an increased risk of harm, here a decreased life expectancy, caused by a doctor's negligence, before the ultimate consequences are known. Because in this case the ultimate injury is death, the increased risk of that result is a decrease in life expectancy. Although loss of chance could also be applied as a label for this injury, we do not view recognizing this injury as a deviation

from traditional tort principles. Rather, in this context it is nothing more than valuation of an item of damages that is routinely valued in other contexts. Scheid and Orthopaedics have conceded, for purposes of summary judgment, that they had a duty toward plaintiff and that they breached that duty. They do not concede that the breach caused a compensable injury, but they have, at this summary judgment stage, not yet contested that their negligence caused JoAnn's chance of long-term survival of cancer to be reduced. They contend only that Indiana does not recognize a reduction in the long-term probability of survival as a compensable injury. In *Dayton Walther Corp. v. Caldwell*, 273 Ind. 191, 198–99, 402 N.E.2d 1252, 1256 (1980), this Court held that the trial court did not err in overruling an objection to evidence of the increased risk of meningitis and epilepsy caused by the defendant's negligence. We concluded that: "To hold otherwise would virtually wipe out any appraisal by an expert medical witness as to an estimate of permanent future impairments." *Id.* Scheid and Orthopaedics attempt to distinguish *Caldwell*, noting that, in *Caldwell*, the plaintiff had, as of trial, already suffered one bout of meningitis. Meningitis was one of the two ultimate potential effects, and even as to meningitis the ultimate consequences were not yet known. *Caldwell* thus foreshadowed recognition of compensation for increased risk of yet unknown but serious consequences.

A number of jurisdictions allow recovery for negligence that has "increased the risk of harm," even where the full ramifications of the defendant's actions are not yet known. *See Cudone v. Gehret*, 821 F.Supp. 266, 270–71 (D.Del.1993) (Delaware would allow jury instruction regarding recovery for increased risk of harm where doctor's alleged malpractice in failing to timely diagnose breast cancer more than doubled possibility of recurrence of breast cancer); *James v. United States*, 483 F.Supp. 581, 587 (N.D.Cal.1980) (in lung cancer case, awarding damages for "the loss of the opportunity for earlier and possibly more effective treatment" in spite of current remission); *Boryla v. Pash*, 960 P.2d 123, 127 (Colo.1998) (directed verdict in favor of the defendant was error in view of evidence that a three-month delay in diagnosing breast cancer could have increased plaintiff's risk of a recurrence); *Petriello v. Kalman*, 215 Conn. 377, 576 A.2d 474, 484–85 (1990) (upholding instruction on compensation for increased likelihood that plaintiff would suffer bowel obstruction); *Moattar v. Foxhall Surgical Assocs.*, 694 A.2d 435, 439–40 (D.C.1997) (plaintiff could presently recover for all future economic injuries when cancer was more probable than not to recur and cause her death).

More specifically, many jurisdictions have recognized a decrease in life expectancy as a cognizable injury. *See Anderson*, 669 A.2d at 78 (recovery for shortened life expectancy due to increased risk of a recurrence of testicular cancer); *Swain v. Curry*, 595 So.2d 168, 172–73 (Fla.Dist.Ct.App.1992) (recovery for increased risk of cancer, decreased chance of survival, and reduction of life expectancy allegedly caused by defendant's failure to diagnose breast cancer in a timely manner); *Knopfer v. Louisiana Patient's Compensation Fund*, 527 So.2d 326, 329 (La.Ct.App.1988) (plaintiff's reduction in life expectancy justified jury award of $500,000 for misdiagnosis of moles as benign); *Morrison v. Stallworth*, 73 N.C.App. 196, 326 S.E.2d 387, 393 (1985) ("[S]hortened life expectancy is a compensable element of damage."); *Davison v. Rini*, 115 Ohio App.3d 688, 686 N.E.2d 278, 283–84 (1996) (recognizing a shortened life expectancy as a cognizable injury where eighty-five percent chance of full recovery was reduced to twenty-five percent chance of surviving five years). *But see Beeman v. Manville Corp. Asbestos Disease Compensation Fund*, 496 N.W.2d 247, 256–57 (Iowa 1993) (maintaining that reduction in life expectancy itself is an element of damages only in South Carolina, which has adopted the "English

Rule" that lost opportunity to live out one's full life is recoverable).

Here, JoAnn has pointed to evidence that would support a finding of both present injury and increased risk of harm. We agree with the authorities that find these sufficient to maintain a cause of action for an increased risk of harm. JoAnn has characterized defendants' actions as having reduced her chance for long-term survival and extinguished the chance for successful removal of her tumor. The doctors testified that JoAnn's chances of complete recovery, sixty to eighty percent in June of 1993, had dropped to a ten to thirty percent chance of surviving five years by May of 1994. JoAnn has suffered physical injuries, including the growth of a cancerous tumor, the destruction of healthy lung tissue, and the collapse of a lung.[11] Scheid and Orthopaedics point to the fact that JoAnn does not ask for past medical expenses or for lost earnings. However, this has no bearing on whether or not she may maintain a separate cause of action for her decreased life expectancy.

In some cases an "intangible" loss may be as great an injury as any that a plaintiff could suffer. JoAnn must live under constant fear that at any time she may suffer a recurrence of her lung cancer. If that occurs, her doctors have testified that she has no chance of survival. This is not too remote or speculative an injury to preclude recovery, and JoAnn should not be forced to wait until she has suffered a relapse to proceed with a cause of action for what is

essentially a daily threat of impending death, or to wait until her husband, on her behalf, is left with a wrongful death claim. As already noted, given the occurrence-based statute of limitations for medical malpractice, these future claims may face substantial obstacles. Money is an inadequate substitute for a period of life, but it is the best a legal system can do. The alternative is to let a very real and very serious injury go uncompensated even if due to negligent treatment. Faced with that choice, we hold that JoAnn has stated a viable cause of action and presented evidence sufficient to defeat summary judgment. Specifically, within the parameters set forth here, we hold that JoAnn may maintain a cause of action in negligence for this increased risk of harm, which may be described as a decreased life expectancy or the diminished probability of long-term survival.

Here, we also have an injury that often accompanies a delay in diagnosis—the invasion of healthy tissue by a tumor or other growth. Accordingly, this case does not present the issue whether a plaintiff must have incurred some physical injury as a result of the defendant's negligence in order to recover for an increased risk of harm.[12] Some courts have concluded, particularly in the loss of chance context, that the loss must be "substantial" before it is compensable.[13] We see no obvious method of quantifying that test.[14] Because we measure damages by probabilizing the injury, the likelihood that plaintiffs will bring claims for trivial reductions in chance of

---

**11.** Scheid and Orthopaedics maintain that the lung collapse was due to JoAnn's history as a smoker, and not lung cancer.

**12.** New Jersey also initially declined to address whether a loss of chance in the absence of physical injury is recoverable, *see Evers*, 471 A.2d at 412 n. 7, and later concluded in a toxic tort case that it was not, *see Ayers*, 525 A.2d at 308.

**13.** *See Dickey ex rel. Dickey v. Daughety*, 260 Kan. 12, 917 P.2d 889, 890–91 (1996) (citing *Delaney*, 873 P.2d at 175) (articulating rule in Kansas that in order to recover in a loss of chance case, "loss" must be substantial); *Per-*

*ez*, 805 P.2d at 592 (allowing loss of chance where plaintiff can show that "some negligent act or omission by health care providers reduced a substantial chance of survival").

**14.** Judge Posner, in dissent, has argued forcefully that an increased risk of harm, to any extent, should be compensable. *See DePass v. United States*, 721 F.2d 203, 206–10 (7th Cir. 1983). Allowing recovery for the lost chance, he argues, furthers an important goal of tort law—putting the victim in as near a position as he would have been before harmed. *See id.* at 210.

recovery seems small. If, in the future, we face a volume of insignificant claims, perhaps such a rule will become necessary. For now, we are content to rely on basic economics to deter resort to the courts to redress remote probabilities or insubstantial diminutions in the likelihood of recovery.

## D. Valuation [15] of the Injury

■ We have referred to a "reduced probability of survival" and "diminished life-expectancy" as two terms for the same concept. This requires some explanation. In the Alexanders' case, let us assume the jury concludes from the expert testimony that before the failure to diagnose she had a seventy percent chance of full recovery and a normal life expectancy. As already noted, this is a statistical proposition that seventy of 100 patients with JoAnn's initial condition will have a normal lifetime. To take the simplest example first, assume that there is a 100% chance of successful treatment if there were no negligence. Leaving aside any other individual factors, the patient's life expectancy is the median of our collective experience as to the age at death of persons of her age and gender. Otherwise stated, a life expectancy is no more than the composite of the remaining lives of a large number of people, some of whom will die the next day and some of whom will become nonagenarians.

Here, at the time of diagnosis, the expert testimony put her chance of survival for five years at approximately twenty percent. To be comparable to her pre-negligence expectancy, it must be converted, which we assume can be done, into a comparable median lifetime or expectancy. A person with a normal life expectancy has only a fifty percent chance of attaining that expectancy. Even if we reduce both the "before" and "after" numbers to comparables, the problem identified earlier remains: expectancy is itself a statistical proposition, and compensating on the basis of expectancy will either overcompensate or undercompensate depending on how long the plaintiff actually lives.

Finally, if we take as our starting point not a normal life expectancy, but the expectancy of someone with an already heightened risk, the analysis is the same, but both the "before" and "after" numbers require a conversion of probability of survival into an expectancy. Presumably we do not have statistics that permit confident evaluation of the anticipated life span of patients with many conditions to the same degree that mortality tables give those values for the general population. Despite these difficulties, and recognizing that it can produce a windfall for some and short-change others, we have compensated for reduced life expectancy in other contexts.[16] Application of the same principles is the best we can do to value the reduced probability of a full recovery.[17] This would val-

**15.** Joseph H. King, Jr., author of the seminal article on "loss of chance" and a recent article updating the same subject, *see Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353 (1981); *"Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss–of–a–Chance Doctrine,* 28 U. Mem. L.Rev. 491 (1998), uses this term to refer to "the process of identifying and measuring the compensable interests destroyed or impaired." *Id.* at 494 n. 12.

**16.** Compensation for reduced life expectancy is routinely awarded in the context of wrongful death claims, *see FMC Corp. v. Brown,* 551 N.E.2d 444, 449–50 (Ind.1990), *Steiner v. Goodwin,* 138 Ind.App. 546, 550–51, 215 N.E.2d 361, 364 (1966), as well as personal

injury claims, *see Smith v. Syd's, Inc.,* 598 N.E.2d 1065, 1067 (Ind.1992), *Prange v. Martin,* 629 N.E.2d 915, 922–23 (Ind.Ct.App. 1994), with the important caveat that the compensation ordinarily takes the form of lost earnings.

**17.** The valuation of a reduced life expectancy in particular has proved difficult for the courts. Courts recognizing a reduced life expectancy have sometimes calculated damages in terms of compensable elements should the injury actually occur, *see Petriello,* 576 A.2d at 484 ("The probability percentage ... can be applied to the damages that would be justified if that harm should be realized."); *Moattar,* 694 A.2d at 440 (holding that a plaintiff may recover for "future consequences based on

ue the injury at the reduction of the patient's expectancy from her pre-negligence expectancy. Ultimately, the jury will have to attach a monetary amount to JoAnn's loss. In so doing, because this is JoAnn's action, the jury will be forced to consider what value to ascribe to the privilege of living. In other contexts, juries are routinely entrusted with the task of awarding damages for injuries not readily calculable. *See Indianapolis Newspapers, Inc. v. Fields,* 254 Ind. 219, 219–20, 259 N.E.2d 651, 656 (1970) (jury awarded $60,000 in libel suit); *Miller v. Ryan,* 706 N.E.2d 244, 247 (Ind.Ct.App.1999) (jury awarded $325,-000 in informed consent claim); *Dollar Inn, Inc. v. Slone,* 695 N.E.2d 185, 187 (Ind.Ct.App.1998) (jury awarded $250,000 in emotional distress damages to plaintiff who was pricked in the thumb by a hypodermic needle concealed in toilet paper roll). Valuing a determinable number of years of life is no more challenging than these exercises.

## II. Negligent Infliction of Emotional Distress

The Alexanders argue that JoAnn is entitled to maintain a cause of action for negligent infliction of emotional distress because she suffered an impact sufficient to satisfy the modified impact rule. Scheid and Orthopaedics argue that JoAnn has failed to satisfy the modified impact rule because, in their words, "the failure to diagnose cancer" does not constitute an impact as required by *Shuamber v. Henderson,* 579 N.E.2d 452 (Ind.1991).

In order to maintain a cause of action for negligent infliction of emotional distress under Indiana law, a plaintiff must

satisfy the "impact rule." The impact rule originally consisted of three elements: (1) an impact on the plaintiff; (2) that causes physical injury to the plaintiff; (3) that in turn causes the emotional distress. *Id.* at 454. This rule precluded recovery for the case in which a plaintiff experienced real mental stress in the absence of a physical injury. We recognized the policy reasons in support of relaxing the impact rule and held in *Shuamber:*

> [W]hen ... a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, we hold that such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

*Id.* at 456. In *Shuamber,* this Court concluded that passengers in a car involved in an accident in which a family member was killed could recover for emotional distress that resulted from the death, even if it was unconnected to their physical injuries. *See id.* In *Conder v. Wood,* we allowed a mental distress claim by a plaintiff who had beat on the side of a truck that was running over her co-worker, concluding that the contact between her fist and the truck satisfied the impact requirement. *See* 716 N.E.2d 432, 433 (Ind.1999).

Similarly, we conclude that the JoAnn has satisfied the elements of negligent infliction of emotional distress under

---

the probability of metastasis and of hastened death"), and for present emotional distress associated with the injury, *see, e.g., James,* 483 F.Supp. at 587–88 (assessing damages for emotional distress, but subtracting for time in which plaintiff did not know he had lung cancer). Other courts have merely stated that a reduced life expectancy is a cognizable injury, but provide no guidance as to how the injury should be valued. *See Cudone,* 821 F.Supp. at 266; *Davison,* 686 N.E.2d at 284–

85 ("[T]rier of fact may ... assess the degree to which the plaintiff's chances of recovery or survival have been decreased and calculate the appropriate measure of damages."). In *Morrison,* the North Carolina Court of Appeals acknowledged that courts have been reluctant to award damages for reduced life expectancy itself because of the difficulty in valuing it, but nonetheless concluded that a shortened life expectancy is compensable in North Carolina. *See* 326 S.E.2d at 393.

the modified impact rule.[18] The impact does not consist, as Scheid and Orthopaedics allege, of the failure to diagnose cancer.[19] Rather, allegedly as a result of the defendants' negligence, JoAnn suffered the destruction of healthy lung tissue by a cancerous tumor. As we held in *Conder*, the purpose of the rule is to confine recovery to those with "direct involvement" in the defendant's negligent act or omission. JoAnn was treated by the defendants and has incurred a physical change as a result. This is good enough. JoAnn testified that she is now being treated with antidepressants and described the devastation surrounding her bleak prognosis. These are reasonable responses under the circumstances. These allegations are sufficient to defeat a summary judgment motion on the issue of emotional distress, and JoAnn is not precluded as a matter of law from proceeding with this claim.

### III. Exacerbation or Aggravation of JoAnn's Injuries

The Alexanders allege that the Court of Appeals erred in failing to address whether JoAnn suffered injuries proximately caused by Scheid and Orthopaedics and whether, as a result of the failure to follow up on her chest x-ray in June of 1993, she sustained an aggravation or exacerbation of her injury. In discussing this claim, the Alexanders speak primarily in terms of the injuries JoAnn incurred between the two x-rays. Defendants respond that, given JoAnn's concession that she seeks neither past medical expenses nor loss of earnings, the Court of Appeals did not err in failing to address this issue.

The Alexanders correctly note that ordinarily a defendant is liable for the aggravation or exacerbation of a current injury, to the extent that the defendant's "conduct has resulted in an aggravation of the pre-existing condition, [but] not for the condition as it was." *Dunn v. Cadiente*, 516 N.E.2d 52, 56 (Ind.1987) (citing William L. Prosser, *Law of Torts* 262 (4th ed.)). Scheid's and Orthopaedics' contention that JoAnn has been unharmed runs contrary to the record. If nothing else, the past injuries JoAnn sustained are substantial. During the time JoAnn's cancer remained undiagnosed, she incurred the destruction of healthy lung tissue, the growth of a cancerous tumor, and the collapse of a lung. ' Thus, JoAnn could conceivably maintain a cause of action for the aggravation of her pre-existing condition. Given that these injuries are injuries for which JoAnn seeks no compensation, however, we agree with Scheid and Orthopaedics that the Court of Appeals did not err in failing to address JoAnn's argument for recovering for aggravation of injury as formulated.

### Conclusion

We grant transfer and reverse and remand to the trial court for proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN and RUCKER, JJ., concur.

---

**18.** Many loss of chance cases have also included a cause of action for emotional distress. *See James v. United States*, 483 F.Supp. 581, 587 (N.D.Cal.1980); *Boryla v. Pash*, 960 P.2d 123, 127 (Colo.1998); *Evers v. Dollinger*, 95 N.J. 399, 471 A.2d 405, 412 (1984).

**19.** Scheid and Orthopaedics rely on *Etienne v. Caputi*, 679 N.E.2d 922 (Ind.Ct.App.1997), for the proposition that the failure to diagnose cancer does not constitute an impact for purposes of the modified impact rule. The Court

of Appeals stated, "[T]he alleged emotional damages arose as a result of [defendant's] incorrect reading of [plaintiff's] mammogram.... We do not see the direct physical impact or direct involvement necessary for the application of the modified impact rule." *Id.* at 926. To the extent that *Etienne* suggests that a physical change in the body resulting from the failure to diagnose an illness does not constitute an impact satisfying the modified impact rule, it is disapproved.